Joseph J. HAZELWOOD, Appellant,

v.

STATE of Alaska, Appellee.

No. 1232.

Court of Appeals of Alaska.

July 10, 1992.

Rehearing Denied Aug. 25, 1992.

Richard H. Friedman and Jeffrey K. Rubin, Friedman and Rubin, Anchorage, Michael G. Chalos and Thomas Russo, Chalos, English & Brown, New York City and Dick L. Madson, Fairbanks, for appellant.

Samuel D. Adams, Asst. Dist. Atty., Edward E. McNally, Dist. Atty., Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

Before BRYNER, C.J., and COATS, J. and HODGES, Superior Court Judge.*

## OPINION

BRYNER, Chief Judge.

Joseph J. Hazelwood was convicted by a jury of negligent discharge of oil, a misdemeanor. *See* AS 46.03.740 and .790(a)(1). Superior Court Judge Karl S. Johnstone sentenced Hazelwood to ninety days in jail and a $1000 fine, suspending both on condition that Hazelwood complete one year of probation, perform 1000 hours of community work, and pay $50,000 in restitution. Hazelwood appeals, contending that the trial court erred in denying his motion to dismiss on grounds of immunity, in failing to suppress certain evidence of intoxication, and in instructing the jury on the applicable culpable mental state for his offense. Hazelwood also appeals his sentence. Because we find Hazelwood's prosecution to have been barred by immunity, we reverse his conviction.[1]

## FACTS

Shortly after midnight on March 24, 1989, the *Exxon Valdez*, an oil tanker operated by the Exxon Shipping Company, ran aground on Bligh Reef, spilling eleven million gallons of oil into Prince William Sound. Hazelwood, the vessel's captain, was in his cabin; he had turned the helm over to Third Mate Gregory Cousins a short time earlier. Cousins immediately summoned Hazelwood to the bridge. Approximately twenty minutes after the grounding, Hazelwood reported the incident by radio to the Coast Guard Traffic Center in Valdez, stating:

Ah, it's Valdez back. Ah, we've—ah, should be on your radar there—we've fetched up, ah, hard aground north of,' ah, Goose Island off Bligh Reef. And, ah, evidently, ah, leaking some oil, and, ah, we're going to be here for awhile.

1. Our holding on the immunity issue makes it unnecessary to address the other issues Hazelwood has raised on appeal.

And, ah, if you want, ah, so you're notified. Over.

Hazelwood's report sparked an immediate investigation by federal and state officials; the investigation yielded evidence that eventually led the state to indict Hazelwood for reckless endangerment, operating a watercraft while intoxicated, and negligent discharge of oil. Hazelwood moved to dismiss the charges, contending, among other things, that he was immune from prosecution because he had immediately reported the *Exxon Valdez*'s grounding and its discharge of oil to the Coast Guard, in compliance with Section 311 of the Federal Water Pollution Control Act, 33 U.S.C. § 1321. Paragraph (b)(5) of this statute requires "Any person in charge of a vessel" such as the *Exxon Valdez* to notify the government immediately of "any discharge of oil or a hazardous substance from such vessel"; the paragraph goes on to confer immunity on any person who complies with this requirement:

Notification received pursuant to this paragraph or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement. *Id.*[2]

In moving to dismiss on grounds of immunity, Hazelwood argued that he had complied with the federal statute's immediate notice requirement by calling the Coast Guard on the radio to report that the *Exxon Valdez* was aground and leaking oil. Hazelwood asserted that the statutory grant of immunity was applicable to his case because his report to the Coast Guard had directly triggered the government's investigation of the spill, and because the state had gathered its evidence against him in the course of that investigation. Hazelwood maintained that his prosecution was therefore based on "information obtained by the exploitation of such notification," in violation of 33 U.S.C. § 1321(b)(5). To support his motion to dismiss, Hazelwood submitted an affidavit stating that, when he called the Coast Guard to notify it of the spill, he was aware such notice was required under 33 U.S.C. § 1321(b)(5), and he believed that he could not be prosecuted for the spill if he reported it.

The state did not dispute Hazelwood's claim of compliance with the immediate notice requirement of 33 U.S.C. § 1321(b)(5), nor did the state dispute that its evidence derived from the investigation triggered by Hazelwood's call to the Coast Guard. The state nevertheless asserted two alternative grounds for rejection of Hazelwood's claim of immunity: the independent source rule and the inevitable discovery doctrine. Following an evidentiary hearing, Judge Johnstone adopted the state's immunity argument, finding both the independent source rule and the inevitable discovery doctrine applicable to Hazelwood's case. Accordingly, Judge Johnstone denied Hazelwood's motion to dismiss.

## DISCUSSION

On appeal, Hazelwood argues that Judge Johnstone erred in invoking the independent source rule and the inevitable discovery doctrine to nullify the grant of im-

---

**2.** In its entirety, 33 U.S.C. § 1321(b)(5) states:

Any person in charge of a vessel or of an onshore facility or an offshore facility shall, as soon as he has knowledge of any discharge of oil or a hazardous substance from such vessel or facility in violation of paragraph (3) of this subsection, immediately notify the appropriate agency of the United States Government of such discharge. Any such person (A) in charge of a vessel from which oil or a hazardous substance is discharged in violation of paragraph (3)(i) of this subsection, or (B) in charge of a vessel from which oil or a hazardous substance is discharged in violation of paragraph (3)(ii) of this subsection and who is otherwise subject to the jurisdiction of the United States at the time of the discharge, or (C) in charge of an onshore facility or an offshore facility, who fails to notify immediately such agency of such discharge shall, upon conviction, be fined not more than $10,000, or imprisoned for not more than one year, or both. Notification received pursuant to this paragraph or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement.

munity set out in 33 U.S.C. § 1321(b)(5). Renewing the arguments it raised below, the state contends that Judge Johnstone properly decided the issue. In resolving the parties' arguments, we will separately consider the two theories relied on by the superior court, turning first to the independent source rule and then to the inevitable discovery doctrine.

### A. Independent Source Rule

■ The independent source rule is intrinsically related to the concept of use and derivative use immunity. The fifth amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." Despite this constitutional command, it is well-settled that the government may compel a person to furnish potentially incriminatory testimony or information in exchange for immunity from future prosecution. See State v. Gonzalez, 825 P.2d 920, 923 (Alaska App.1992). In Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the United States Supreme Court held that the demands of the fifth amendment can be satisfied by "use and derivative use immunity"—a form of immunity prohibiting the use of immunized testimony or any information derived therefrom against the witness from whom it was compelled.[3]

■ Since this form of immunity protects only against the use of compelled testimony and information derived therefrom, it does not categorically bar the state from prosecuting an immunized witness for crimes as to which the witness was compelled to testify; the state remains free to prosecute if it possesses evidence from an "independent source," that is, a source entirely untainted by the compelled testimony.

■ To protect against any infringement of the accused's constitutional privilege against self-incrimination in such cases, however, the law imposes on the state the burden of proving the source of its evidence. Under the independent source rule, "[o]nce immunity is shown, the prosecutor has the burden of demonstrating that its use of the immunized testimony has not tainted any aspect of the case." United States v. De Diego, 511 F.2d 818, 821 (D.C.Cir.1975), quoted in United States v. North, 910 F.2d 843, 865 (D.C.Cir.1990). To meet its burden, "the State must prove that [its] ... evidence was developed or obtained from sources or by means entirely independent of and unrelated to the earlier compelled testimony." State v. Strong, 110 N.J. 583, 542 A.2d 866, 872 (1988).

> This burden of proof ... is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.

Kastigar v. United States, 406 U.S. at 460, 92 S.Ct. at 1665. Because the government always bears the burden of affirmatively proving a wholly independent source, courts "may not infer findings favorable to the government." United States v. North, 910 F.2d at 867. See also United States v. Rinaldi, 808 F.2d 1579, 1583–84 (D.C.Cir. 1987).

■ We must assess the superior court's reliance on the independent source rule in light of these principles. It is undisputed here that the applicable federal statute, 33 U.S.C. § 1321(b)(5), confers use and derivative use immunity on any person who complies with its mandate to provide the government with immediate notice of any

---

3. In State v. Gonzalez, 825 P.2d 920 (Alaska App.1992), we held a broader form of immunity—transactional immunity—to be the minimal level of protection necessary to satisfy the requirements of the Alaska Constitution's privilege against self-incrimination. Alaska Const., art. I, § 9. In the present case, 33 U.S.C. § 1321(b)(5) conferred use and derivative use immunity rather than transactional immunity. Notwithstanding the limited scope of immunity offered under

the federal statute, Hazelwood complied with its immediate notice requirement and did not attempt to invoke his privilege against self-incrimination. On appeal, Hazelwood has not argued that the statutory grant of immunity was deficient. Given these circumstances, we need not consider or decide any issue involving the adequacy of use and derivative use immunity in this case.

discharge of oil. It is further undisputed that Hazelwood, as captain of the *Exxon Valdez*, became obligated to provide notice under this statute when his ship ran aground and began to discharge oil into the waters of Prince William Sound. Additionally, as we have previously indicated, the state has acknowledged that Hazelwood's radio communication to the Coast Guard complied with the immediate notice requirement and that virtually all of its evidence against Hazelwood actually derived from Hazelwood's report. Under the circumstances, Hazelwood plainly made a threshold showing that his report to the Coast Guard fell within the federal statute's immunity provision; the state thus bore the burden of affirmatively proving an independent source for its evidence.

In advancing its independent source theory, the state relied primarily on a regulation dealing with the reporting of marine casualties. Under 46 CFR § 4.05-1, "The owner, agent, master or person in charge of a vessel involved in a marine casualty" must "give notice as soon as possible" to the Coast Guard if the casualty creates an environmental hazard (46 CFR § 4.05-1(a)), adversely affects the vessel's seaworthiness (46 CFR § 4.05-1(c)), or results in property damage of more than $25,000 (46 CFR § 4.05-1(f)).[4] This regulation is part of a larger regulatory scheme promulgated "to increase the likelihood of timely assistance to vessels in distress." 46 CFR

§ 4.01-1. Its immediate notice provision deals only with marine casualties and is unrelated to the statutory provision upon which Hazelwood bases his claim of immunity—33 U.S.C. § 1321(b)(5)—which deals with reports of oil spills. Unlike the immediate notice provision of the oil spill statute, the marine casualty regulation does not build in a grant of immunity.

Based on the marine casualty regulation, the state argued below that, upon grounding the *Exxon Valdez*, Hazelwood incurred two separate legal duties. According to the state, the first duty arose under the oil spill statute, 33 U.S.C. § 1321(b)(5). The state asserted that Hazelwood's only duty under this provision was to report that the *Exxon Valdez* was discharging oil into the water; he was under no obligation to report the grounding of his vessel. In the state's view, a second, separate duty arose under the marine casualty regulation, 46 CFR § 4.05-1, which, according to the state, was the only provision requiring Hazelwood to report that his vessel had run aground and was damaged.

Having erected this dichotomy between the requirements of the oil spill statute and the marine casualty regulation, the state focused on the words Hazelwood spoke to the Coast Guard immediately following the grounding of his vessel: "[W]e've fetched up ... hard aground north of ... Goose Island off Bligh Reef. And, ... evidently,

---

**4.** The full text of 46 CFR § 4.05-1 is as follows:

*Notice of marine casualty.*

The owner, agent, master or person in charge of a vessel involved in a marine casualty shall give notice as soon as possible to the nearest Coast Guard Marine Safety or Marine Inspection Office whenever the casualty involves any of the following:

(a) All accidental groundings and any intentional grounding which also meets any of the other reporting criteria or creates a hazard to navigation, the environment, or the safety of the vessel;

(b) Loss of main propulsion or primary steering, or any associated component or control system, the loss of which causes a reduction of the maneuvering capabilities of the vessel. Loss means that systems, component parts, sub-systems, or control systems do not perform the specified or required function;

(c) An occurrence materially and adversely affecting the vessel's seaworthiness or fitness

for service or route, including but not limited to fire, flooding, or failure or damage to fixed fire extinguishing systems, lifesaving equipment, auxiliary power generating equipment, or bilge pumping systems;

(d) Loss of life;

(e) Injury which requires professional medical treatment beyond first aid and, in the case of a person engaged or employed on board a vessel in commercial service, which renders the individual unfit to perform routine vessel duties;

(f) An occurrence not meeting any of the above criteria but resulting in damage to property in excess of $25,000. Damage cost includes the cost of labor and material to restore the property to the service condition which existed prior to the casualty, but does not include the cost of salvage, cleaning, gas freeing, drydocking or demurrage.

... [we're] leaking some oil, and ... we're going to be here for awhile." The state urged Judge Johnstone to construe this radio message as embodying two distinct and wholly independent reports—one providing notice of the oil spill, in compliance with 33 U.S.C. § 1321(b)(5), and the other giving notice of the grounding of the *Exxon Valdez*, as required by 46 CFR § 4.05–1.

The state argued that, since Hazelwood's obligation to report the grounding of his vessel had arisen only under the marine casualty regulation, which did not provide for immunity, his statement, "we've fetched up hard aground," amounted to a source of evidence that was wholly independent of his statement, "evidently, [we're] leaking some oil," which the state conceded to be covered by the immunity clause of the oil spill reporting statute.

At the evidentiary hearing before the superior court, the state supported its independent source argument by presenting testimony indicating that the official investigation of the *Exxon Valdez* incident was prompted by the vessel's grounding as well as by its discharge of oil. According to the state's witnesses, the investigation would have been no different had Hazelwood reported only the grounding. On this basis, the state asserted that its evidence against Hazelwood actually derived from two wholly independent sources, one of which—the report of the grounding—was not subject to any claim of immunity.

Judge Johnstone accepted the state's argument, finding, in relevant part:

[T]he defendant's initial report of a grounding constitutes an independent source for the information-gathering process and that all information gathered, except for the defendant's report of the spill itself, is otherwise from a source wholly independent from his protected report.

On appeal, the state argues that this finding should be upheld. However, the state's independent source argument is both legally and factually flawed.

**5.** 33 CFR § 153.203 states:

In the abstract, the legal theory underlying the state's independent source argument is plausible. One who reports information to the government gratuitously, being under no obligation to do so, cannot later claim that the information was compelled in violation of the privilege against self-incrimination. For precisely this reason, this court has previously recognized that a person who submits a report to the state in response to a statutory reporting requirement cannot later invoke the privilege against self-incrimination to the extent that the facts included in the report went beyond the scope required by the statute. *Creary v. State*, 663 P.2d 226, 229–30 (Alaska App.1983). In the present case, if 33 U.S.C. § 1321(b)(5) required Hazelwood to report only the fact that the *Exxon Valdez* was discharging oil, then his statement that the vessel was grounded might be viewed as a gratuitous one. To the extent this statement went beyond the scope of the reporting requirement, the statutory promise of immunity arguably did not attach to it.

While this legal theory is potentially meritorious in the abstract, its viability depends entirely on the premise that, under the oil spill notice statute, Hazelwood had no duty to report his ship's grounding but was required only to report its discharge of oil. This premise, which the state convinced the superior court to accept, is incorrect as a matter of law.

The language of 33 U.S.C. § 1321(b)(5) does not itself specify what information the captain of a vessel must give in providing notice of a discharge of oil. However, the Department of Transportation has implemented the statutory reporting requirement through regulations commanding notice of details beyond the mere fact of a discharge. The provisions of 33 CFR § 153.203 were specifically promulgated to deal with spills covered under 33 U.S.C. § 1321(b)(5). The regulation echoes the statute's notice requirement, providing that the captain of a vessel discharging oil must immediately notify the Coast Guard.[5]

*Procedure for the notice of discharge.* Any

A related regulation, 33 CFR § 151.15, spells out the information that must be reported for spills involving several categories of noxious liquid substances. This regulation requires the captain of a vessel such as the *Exxon Valdez* to notify the Coast Guard of an incident involving the unauthorized discharge of a noxious liquid substance. Paragraph (a) of the regulation requires the report to include "the particulars of such incident ... to the fullest extent possible in accordance with the provisions of this section." Paragraph (f) goes further, specifying the particulars that a report must contain:

(f) Each report shall contain—

(1) The identity of the ship;

(2) The time and date of the occurrence of the incident;

(3) The geographic position of the ship when the incident occurred;

(4) The wind and sea condition prevailing at the time of the incident;

(5) *Relevant details respecting the condition of the ship;* and

(6) A statement or estimate of the quantity of oil or oily mixtures discharged or likely to be discharged into the sea. [Emphasis added.]

Then, in paragraph (h), the regulation makes it clear that its reporting requirements apply specifically to reports of oil spills filed in accordance with 33 CFR § 153.203—the regulation implementing the oil spill notice requirement of 33 U.S.C. § 1321(b)(5): "A report made under this section will satisfy the reporting requirement of § 153.203 of this chapter." [6]

person in charge of a vessel or of an onshore or offshore facility shall, as soon as they have knowledge of any discharge of oil or a hazardous substance from such vessel or facility in violation of section 311(b)(3) of the Act, immediately notify the National Response Center (NRC), U.S. Coast Guard, 2100 Second Street, SW., Washington, DC 20593, toll free telephone number 800–424–8802 (in Washington, DC metropolitan area, (202) 267–2675). If direct reporting to the NRC is not practicable, reports may be made to the Coast Guard or EPA predesignated OSC for the geographic area where the discharge occurs. All such reports shall be promptly relayed to the NRC. If it is not possible to notify the NRC or the predesignated OSC immediately, reports may be made immediately to the nearest Coast Guard unit, provided that the person in charge of the vessel or onshore or offshore facility notifies the NRC as soon as possible.

6. The full text of 33 CFR § 151.15 is as follows: *Reporting Requirements.*
(a) The Master or other person having charge of a ship involved in an incident referred to in paragraph (e) of this section, shall report the particulars of such incident without delay and to the fullest extent possible in accordance with the provisions of this section.
(b) In the event of the ship referred to in paragraph (a) of this section being abandoned, or in the event of a report from such ship being incomplete or unobtainable, the owner, charterer, manager or operator of the ship, or their agents shall, to the fullest extent possible assume the obligations placed upon the Master or other person having charge of the ship under the provisions of this section.
(c) Each report shall be made by radio whenever possible, but in any case by the fastest available means at the time the report is made.

(d) Reports shall be directed to the appropriate officer or agency of the government of the country in whose waters the incident occurs. Additionally, for incidents involving U.S. ships, the reports shall be directed to either the nearest Coast Guard Captain of the Port (COTP) or to the National Response Center (NRC), toll free telephone number 800–424–8802, telex number 892427.
(e) The report shall be made whenever an incident involves—
(1) A discharge other than as permitted under this part; or
(2) A discharge permitted under this part by virtue of the fact that—
(i) It is for the purpose of securing the safety of a ship or saving life at sea; or
(ii) It results from damage to the ship or its equipment; or
(3) The probability of a discharge referred to in paragraphs (e)(1) or (e)(2) of this section.
(f) Each report shall contain—
(1) The identity of the ship;
(2) The time and date of the occurrence of the incident;
(3) The geographic position of the ship when the incident occurred;
(4) The wind and sea condition prevailing at the time of the incident;
(5) Relevant details respecting the condition of the ship; and
(6) A statement or estimate of the quantity of oil or oily mixtures discharged or likely to be discharged into the sea.
(g) Each person who is obligated under the provisions of this section to send a report shall—
(1) Supplement the initial report, as necessary, with information concerning further developments; and
(2) Comply as fully as possible with requests from affected countries for additional information concerning the incident.

Given this provision, the conclusion seems inescapable that 33 CFR § 151.15 applied to Hazelwood's report of an oil spill. In seeking to comply with the immediate notice requirement of 33 U.S.C. § 1321(b)(5) by informing the Coast Guard that the *Exxon Valdez* was discharging oil, Hazelwood had a duty, under 33 CFR § 151.15(f)(5), to report all "[r]elevant details respecting the condition of the ship." His obligation thus went beyond the mere duty to report a discharge of oil; it also included the duty to report that his ship was grounded. Because information concerning the grounding constituted an integral part of the notice required under 33 U.S.C. § 1321(b)(5), Hazelwood's report of the grounding fell within that statute's immunity provision, just as his report of the spill itself did.

■■■■ From the record it appears that the regulations implementing 33 U.S.C. § 1321(b)(5) were never called to Judge Johnstone's attention. In light of these regulations, the superior court's finding of an independent source must be deemed incorrect as a matter of law. Hazelwood may well have been legally obligated to report the grounding of the *Exxon Valdez* under two distinct regulatory schemes, one providing for immunity (33 U.S.C. § 1321(b)(5) and 33 CFR § 151.15(f)(5)), and the other, not (46 CFR § 4.05–1). Given the coextensive nature of these two reporting requirements, however, the most that can be said is that they amounted to wholly interdependent, not wholly independent, sources of the state's evidence.[7]

Under the circumstances, the trial court was clearly erroneous in finding that the state had met its burden of proving the existence of an independent source.

## B. *Inevitable Discovery Doctrine*

Since we conclude that the superior court's application of the independent source rule cannot be sustained, we must next turn to its reliance on the inevitable discovery doctrine.

This doctrine, fashioned by courts as an exception to the exclusionary rule in cases involving illegally obtained evidence, is in effect a hypothetical variation upon the independent source rule: courts have applied the doctrine to avoid suppressing illegally obtained evidence when the prosecution has demonstrated that, although its evidence actually derived from a source tainted by illegality, the same evidence would inevitably have been discovered through lawful, untainted means had the illegality not occurred. *See generally* W.R. LaFave, *Search and Seizure*, § 11.-4(a) at 378–88 (2d ed. 1987).

The inevitable discovery doctrine was formally recognized by the United States Supreme Court under federal constitutional law in *Nix v. Williams*, 467 U.S. 431, 104

---

(h) A report made under this section will satisfy the reporting requirement of § 153.203 of this chapter.

**7.** Furthermore, even if the state were not mistaken in asserting that the marine casualty regulation and the oil spill statute embody two mutually exclusive reporting requirements, the record in the present case would still fail to support application of the independent source rule. As we have already indicated, to comply with the requirements of the independent source rule, the state bore the burden of proving that its evidence was actually—not theoretically—derived from a source wholly independent of Hazelwood's immunized report that his vessel was discharging oil. This burden could be satisfied only by affirmative proof establishing the legitimate source from which the state actually obtained its evidence. *Kastigar v. United States,* 406 U.S. 441, 461–62, 92 S.Ct. 1653, 1665–66, 32 L.Ed.2d 212 (1972). It could not be met by proof of a hypothetical source from which un-

tainted information might have been gained. The superior court was not permitted to infer facts favorable to the prosecution. *United States v. Rinaldi,* 808 F.2d 1579, 1583–84 (D.C.Cir.1987).

Here, the only evidence in the record tending to establish Hazelwood's purpose in contacting the Coast Guard is his own, uncontroverted affidavit. In the affidavit, Hazelwood swore that he reported that the *Exxon Valdez* was aground and leaking oil in order to comply with the requirements of 33 U.S.C. § 1321(b)(5); he indicated that he believed this report would entitle him to immunity. There is simply no evidence in the record to support a factual finding that Hazelwood actually reported the grounding to comply with the marine casualty regulation; consequently, there is no evidentiary basis for finding the actual existence of an independent source for the state's evidence.

S.Ct. 2501, 81 L.Ed.2d 377 (1984). Although most jurisdictions considering the doctrine have adopted it, *Nix v. Williams,* 467 U.S. at 440–41, 104 S.Ct. at 2507–08, courts differ as to its precise implementation. *Compare, e.g., United States v. Satterfield,* 743 F.2d 827 (11th Cir.1984), *with United States v. Ramirez–Sandoval,* 872 F.2d 1392 (9th Cir.1989). In several previous decisions, we have noted the doctrine, but we have never been called upon to adopt it as a matter of Alaska law. *See, e.g., State v. Lewis,* 809 P.2d 925, 930 n. 3 (Alaska App.1991); *Ricks v. State,* 771 P.2d 1364, 1369 n. 3 (Alaska App.1989), *modified on other grounds, State v. Ricks,* 816 P.2d 125 (Alaska 1991); *Krukoff v. State,* 702 P.2d 664, 666 n. 2 (Alaska App.1985).

■ In the present case, witnesses called by the state during the evidentiary hearing testified that the grounding of the *Exxon Valdez* would in all likelihood have been discovered and investigated, with negligible delay, even if Hazelwood had failed to notify the Coast Guard immediately. Based on this testimony, Judge Johnstone declared the inevitable discovery doctrine applicable:

> The defendant's report of the grounding notwithstanding, the state inevitably would have discovered the grounding of the *Exxon Valdez* and initiated the investigatory process by not later than 12:45 a.m. on March 24, 1989. The court further concludes, based on the facts, that the investigating team … would have arrived at approximately the same time as they, in fact, did. Any observation made or investigation actually commenced would have been made or commenced at approximately the same time.

For present purposes, we may assume that the inevitable discovery doctrine would be adopted in Alaska in appropriate cases and that Judge Johnstone's factual findings concerning the inevitability of the *Exxon Valdez*'s discovery are supported by the record. Application of the inevitable discovery doctrine in this case is nevertheless problematic.

In its original context—situations involving police misconduct—the inevitable discovery doctrine serves the salutary purpose of tempering the exclusionary rule. The exclusionary rule requires suppression of illegally obtained evidence and all fruits thereof; its primary purpose is to deter official lawlessness:

> As the Supreme Court explained in *Nix v. Williams,* the inevitable discovery doctrine is … intended to ensure that suppression does not outrun the deterrence objective [of the exclusionary rule]: the prosecution is neither "put in a better position than it would have been if no illegality had transpired" nor "put in a *worse* position simply because of some earlier police error or misconduct."

W.R. LaFave, *Search and Seizure* § 11.-4(a), at 381 (2d ed. 1987) (footnotes omitted).

The exclusionary rule and the inevitable discovery doctrine work in tandem to strike a balance between the need for deterrence of official misconduct, on the one hand, and the need to protect the state's legitimate interest in using reliable evidence of crime, on the other; the purpose of this balance is "to mark 'the point of diminishing returns of the deterrence principle.'" *Id.* at 373, *quoting* Amsterdam, *Search, Seizure, and Section 2255: a Comment,* 112 U.Pa. L.Rev. 378, 389 (1964).

By contrast, a different principle is at work in the immunity context. Evidence is not unlawfully obtained when an individual provides information to the government under a grant of immunity. Hence, the exclusion of information that derives from immunized testimony is unrelated to deterrence of official misconduct; rather, exclusion occurs for the direct purpose of enforcing the government's assurance that no statement given under immunity, and no evidence derived therefrom (or, in the words of 33 U.S.C. § 1321(b)(5), no "information obtained by exploitation of" an immunized report) will be used against the person who was compelled to give the statement.

The manner in which a promise of immunity operates reflects the dual nature of the privilege against self-incrimination:

> The constitutional privilege against self-incrimination has two primary inter-

related facets: The Government may not use compulsion to elicit self-incriminating statements, ... and the Government may not permit the use in a criminal trial of self-incriminating statements elicited by compulsion.

*Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 57 n. 6, 84 S.Ct. 1594, 1598 n. 6, 12 L.Ed.2d 678 (1964).

Because the ultimate aim of the constitutional privilege is to assure that no compelled statement will be used against the accused in a criminal case, the Supreme Court has long recognized that the first facet of the privilege—its protection against compulsory elicitation of potentially incriminating statements—may be properly invaded by the government, but only in exchange for a guarantee that the second facet of the privilege—the use of compelled statements or evidence derived therefrom—will not be breached. *See Brown v. Walker*, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896). Thus, the exclusion of evidence in the immunity context is directly necessary to uphold the second facet of the constitutional privilege, a facet the government specifically promises to enforce in exchange for the opportunity to compel the disclosure of potentially incriminating information.

The differing roles played by the exclusionary rule in cases involving illegally obtained evidence and cases of immunity—deterrence, on the one hand, and enforcement of the constitutional privilege itself, on the other—are of critical importance in determining whether the inevitable discovery doctrine should apply in the immunity context:

Evidence obtained through a coercive interrogation, like evidence obtained through an illegal search, is excluded at trial because the Constitution prohibits such methods of gathering evidence. The exclusionary rules provide a partial and inadequate remedy to some victims of illegal police conduct, and a similarly partial and inadequate deterrent to police officers. An immunity statute, on the other hand, is much more ambitious than any exclusionary rule. It does not mere-

ly attempt to provide a remedy for past police misconduct, which never should have occurred. An immunity statute operates in advance of the event, and it authorizes—even encourages—interrogation that would otherwise be prohibited by the Fifth Amendment....

[B]ecause an immunity statute gives constitutional approval to the resulting interrogation, the government is under an obligation ... to remove the danger of incrimination completely and absolutely, whereas in the case of the exclusionary rules it may be sufficient to shield the witness from the fruits of the illegal search or interrogation in a partial and reasonably adequate manner.... The Constitution does not authorize police officers to coerce confessions or to invade privacy without cause, so long as no use is made of the evidence they obtain. But ... the Constitution does authorize the government to compel a witness to give potentially incriminating testimony, so long as no incriminating use is made of the resulting evidence. Before the government puts its seal of approval on such an interrogation, it must provide an absolutely reliable guarantee that it will not use the testimony in any way at all in aid of prosecution of the witness.

*Kastigar v. United States*, 406 U.S. at 470–71, 92 S.Ct. at 1669–70 (Marshall, J., dissenting).

In view of these differences, the United States Supreme Court has been careful to distinguish between the "balancing of interests ... thought to be necessary ... when the attempt to deter unlawful police conduct" is involved, *New Jersey v. Portash*, 440 U.S. 450, 459, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501 (1979), and the less flexible approach toward excluding evidence that is necessary in immunity cases:

Testimony given in response to a grant of legislative immunity is the essence of coerced testimony.... Here, ... we deal with the constitutional privilege against compulsory self-incrimination in its most pristine form. *Balancing, therefore, is not simply unnecessary. It is impermissible.*

*Id.* (emphasis added). *Cf. United States v. North*, 910 F.2d at 868–71 (distinguishing, on similar grounds, the rule prohibiting challenge to federal indictments based on use of illegally obtained evidence before the grand jury from the rule allowing challenges to indictments obtained through use of immunized testimony or the fruits thereof).

These fundamental differences between the exclusion of evidence in cases of illegally obtained evidence and cases of evidence derived from immunized information lead us to conclude that the inevitable discovery doctrine—an exception rooted in the pragmatism of the exclusionary rule and its narrow deterrent purpose—has no application in the immunity context. The use of inevitable discovery in this context would be directly contrary to the express protection of the privilege against self-incrimination. Such use of the doctrine would also be virtually unprecedented. Although courts applying the inevitable discovery doctrine in cases involving police misconduct have not distinguished between evidence obtained in violation of the fourth, fifth and sixth amendments, *see, e.g., United States v. Martinez–Gallegos*, 807 F.2d 868 (9th Cir.1987), the state has cited no case in which the doctrine has been applied in the immunity context; after independent effort, we have found none.

There is, moreover, an element of basic fairness to be considered in determining whether the inevitable discovery doctrine should apply in the context of immunity. A grant of immunity is essentially a contract in which the government bargains for information in return for an assurance of future protection. Here, the superior court found, and the state has effectively conceded, that the evidence against Hazelwood was in fact obtained "by the exploitation of" Hazelwood's report that the *Exxon*

*Valdez* ran aground and was leaking oil. 33 U.S.C. § 1321(b)(5). Although the state, by invoking the inevitable discovery doctrine, seeks dispensation from the promise of immunity expressly made in the federal statute, it is difficult to see how such dispensation can be justified. Having gained its evidence from the exploitation of information it obtained by a promise of immunity, the state should not be free to renege merely because, in retrospect, the promise appears to have been unnecessary. *Cf. Closson v. State*, 812 P.2d 966, 974–75 (Alaska 1991).

On a more practical level, applying the inevitable discovery doctrine in this context would also run afoul of Congress' determination that public policy justifies the granting of immunity in cases such as this. The congressional purpose in granting immunity for the immediate report of a spill was to encourage prompt notice in as many cases as possible, so that abatement efforts could be undertaken without unnecessary delay, and so that the government would become aware of smaller spills that might otherwise go undetected. *See, e.g., United States v. Mobil Oil Corporation*, 464 F.2d 1124 (5th Cir.1972). Adding an exception to the congressional grant of immunity for cases in which a finding of inevitable discovery could eventually be made would unquestionably frustrate the congressional purpose of encouraging prompt notice in all cases. Such an exception would discourage compliance by persons who potentially stood to incriminate themselves, particularly in cases where the size of the discharge made it predictable at the outset that the inevitable discovery doctrine would preclude any subsequent claim of immunity.[8]

■ Finally, assuming the doctrine of inevitable discovery could be applied in the immunity context without violence to the

---

**8.** In this regard, it is worth mentioning that the superior court appears to have been under the impression that section 311(b) of the Federal Water Pollution Control Act of 1972, 33 U.S.C. § 1321(b), was meant to apply primarily to spills involving small quantities of oil and hazardous substances. The legislative history of the provision belies this interpretation. Although the provision was unquestionably meant

to apply to small spills of hazardous substances that might otherwise go undetected, it was also unquestionably meant to apply to large spills, the immediate notice of which was deemed necessary to assure that abatement efforts could begin promptly. *See* Federal Water Pollution Control Act Amendments of 1972, P.L. 92–500, Senate Report 92–414, 1972 U.S.C.C.A.N. 3668, 3731–33.

**954**

constitutional privilege against self-incrimination, the question would still remain as to who should apply the doctrine.[9] In cases involving illegally obtained evidence, the inevitable discovery doctrine operates as a judicially created exception to the judicially created exclusionary rule. In the context of a judicially created rule, the appropriateness of a judicially fashioned limitation seems self-evident. In contrast, we deal here with a congressionally enacted grant of immunity which, on its face, seems unconditional. While Congress could have readily carved out an exception to the immunity clause of the oil spill notice statute for cases in which spills would inevitably have been discovered, it did not do so.

The power of a court, especially a state court, to engraft such an exception onto a federal statute that provides for none is open to serious doubt, particularly in the immunity context. If an exception to the congressional grant of immunity is to be made in this case, we think it clear that Congress is the only body to make it. "It is not for us to add to the legislation what Congress pretermitted." *United States v. Monia,* 317 U.S. 424, 430, 63 S.Ct. 409, 412, 87 L.Ed. 376 (1943).

We conclude that the inevitable discovery doctrine, like the independent source rule, is inapplicable in this case. Because the superior court erred in applying both the independent source rule and the inevitable discovery doctrine, Hazelwood's conviction must be reversed.

Lest our insistence on this outcome be mistaken for enthusiasm, we add several words. The unparalleled environmental devastation wrought by the grounding of the *Exxon Valdez* is hardly lost upon this court. But while we may feel sorely tempted, as individuals, to recast the law in a mold better suited to our personal sense of justice, we are bound, as judges, to resist this temptation: our sworn duty is to uphold the law as it is, not as we would have it be. We are free to question the wisdom of Congress; we are not free to change the laws it enacts.

What the law requires in this case is clear, and leaves little room for our own personal preferences. Congress has barred prosecution in this case because the state obtained its evidence by the exploitation of Hazelwood's report of an oil spill. The federal statute's prescription of immunity will undoubtedly be a bitter pill for many Alaskans to swallow; dismissing the charges in this case in order to protect Hazelwood from conviction based on the use of tainted evidence may seem a cure far worse than the disease. Yet, by requiring immunity today, the federal statute encourages immediate reporting in the event of a spill tomorrow. If this encouragement averts catastrophic environmental losses in future incidents, then Congress' decision to favor immunity over prosecution may, in the long run, prove to be a wise one. It is not for this court to say otherwise.

The judgment of conviction in this case must be REVERSED.

MANNHEIMER, J., not participating.

---

**9.** A conclusion that the inevitable discovery doctrine would be constitutionally permissible in the immunity context would not be determinative of whether the doctrine should in fact be applied to statutory grants of immunity, since Congress may elect to confer immunity in exchange for information even when that immunity is not strictly necessary. Because 33 U.S.C. § 1321(b)(5) is congressionally enacted, its grant of immunity is not necessarily limited in scope to cases in which the constitutional privilege against self-incrimination would attach. Federal cases have held that, given the statute's underlying purpose of fostering compliance with the requirement of immediate notice, its provision for immunity extends even when a corporate entity, to which the fifth amendment privilege does not extend, complies. *See United States v. Republic Steel Corp.,* 491 F.2d 315 (6th Cir.1974); *United States v. Mobil Oil Corp.,* 464 F.2d 1124 (5th Cir.1972). These cases make it clear that the issue of whether the inevitable discovery doctrine should be applied in the case of a statutory grant of immunity is distinct from the issue of whether the doctrine is constitutionally permissible in such a case.