STATE of Alaska, Petitioner,

v.

James P. RIVERS, Respondent.

No. A–8918.

Court of Appeals of Alaska.

Nov. 3, 2006.

Kenneth J. Diemer, Assistant Attorney General, Office of Special Prosecutions and

---

2. *Smith v. Cleary,* 24 P.3d 1245, 1249 n. 13     (Alaska 2001).

Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Petitioner.

David W. Miner, Attorney, and Joshua P. Fink, Public Advocate, Office of Public Advocacy, Anchorage, for the Respondent.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

COATS, Chief Judge.

James P. Rivers faces charges of theft of unemployment benefits and making false statements to obtain unemployment benefits. Rivers moved to suppress the statements he made to a Division of Employment Security investigator at an interview. Superior Court Judge Michael L. Wolverton granted Rivers's suppression motion. Judge Wolverton found that Rivers was legally compelled by state statute and Division of Employment Security policy to submit to an interview by an Employment Security Division investigator. Judge Wolverton therefore suppressed all the statements Rivers made in the interview. The State filed a petition for review of this ruling. We granted review. We reverse Judge Wolverton's ruling. We conclude that at the time Rivers made the statements during the interview, he was not in custody, did not exercise his privilege against self-incrimination, and was not coerced into giving up his right to remain silent.

### Factual and procedural background

An investigator with the Employment Security Division of the Department of Labor, Harold G. Marley, suspected Rivers of fraudulently obtaining unemployment insurance benefits. Based on his review of Rivers's records, Marley concluded that Rivers had received excess benefits of approximately $4718. Marley telephoned Rivers and set up an interview with him.

At the beginning of the interview, Marley put Rivers under oath. Marley never informed Rivers that he was free to leave, but he did inform Rivers that "[i]f at any time during the procedure, . . . you want to take a break, stop, . . . you want to review a question, go back, just say so." During the interview Rivers made incriminating statements.

A grand jury indicted Rivers on one count of second-degree theft by deception.[1] The State later charged Rivers by supplemental information with multiple counts of false statements to secure benefits.[2]

Rivers moved to suppress the incriminating statements he made during the interview with Marley. Judge Wolverton conducted an evidentiary hearing on Rivers's motion to suppress. At the hearing, Marley testified that he did not remember the specific conversation he had with Rivers when he set up the interview. But he testified that his practice was to encourage claimants to participate in an interview. He would sometimes inform claimants that their failure to provide information might result in their disqualification for future benefits.

Rivers also introduced an Unemployment Insurance Claimant handbook. The handbook details a claimant's responsibilities and is sent to everyone who opens a new unemployment insurance account. The handbook emphasized that a claimant had to comply with the requirements outlined in the handbook in order to be eligible for unemployment insurance benefits. The handbook explained that a claim is subject to a quality control audit where information that the claimant provided would be checked for accuracy. The handbook cautioned that the "examinations are thorough and may involve an in-person interview with you and other interested parties."

Based on these circumstances, Rivers argued that his statements were involuntary. Rivers argued that he faced a coercive atmosphere where he was required by statute to participate in the interview and had to justify the information supporting his claim for unemployment insurance or face the loss of his benefits.

Rivers claimed that AS 23.20.070, as supplemented by the information in the handbook, forced him to attend the interview and

---

1. AS 11.46.130(a)(1) & AS 11.46.180.

2. AS 23.20.485.

provide information. If he did not, he would lose his unemployment benefits. He argued that this amounted to an "explicit" economic threat and that he was therefore coerced into making the incriminating statements at the interview, and that this coercion violated his right against self-incrimination. In addition, Rivers argued that the interview constituted custodial interrogation that required the investigator to administer a *Miranda* warning before interviewing him. Based on these contentions, Rivers argued that either immunity should have attached under AS 23.20.070 or his statements should have been suppressed.

Judge Wolverton found that Rivers had not been subjected to custodial interrogation, and therefore the state was not required to give him a *Miranda* warning. But he found that Rivers was legally compelled by the statute and the department policy as set out in the handbook to appear and speak with the investigator at the Division of Employment Security. Judge Wolverton concluded that because Rivers's statements were coerced, he was required to suppress Rivers's statements. He also noted that Marley had not warned Rivers of his right to terminate the interview at any time. Judge Wolverton concluded that this omission, coupled with the coercion, made Rivers's statements involuntary. He therefore suppressed the statements Rivers made during the inter-

view. The State filed a petition for review of this decision. We granted review.

*Under AS 23.20.070 Rivers is required to assert his right against self-incrimination*

Alaska Statute 23.20.070 provides that a person who has claimed unemployment benefits is not excused from attending and testifying at an interview on the ground that he might incriminate himself. The statute goes on to provide that "[a]n individual may not be prosecuted or subjected to a penalty [if he] is compelled, after having claimed the privilege against self-incrimination, to testify or produce evidence." The statute, on its face, requires the individual to claim the privilege against self-incrimination in order to obtain immunity from prosecution.

We have found several cases interpreting statutes that provide immunity from prosecution when a person is required to produce evidence that otherwise might result in criminal charges. The cases discuss two categories of immunity statutes. In the first category, are statutes that grant immunity to a person who is compelled to testify regardless of whether the person asserts the privilege against self-incrimination.[3] The second category of statutes requires a person to assert his privilege against self-incrimination before testifying in order to obtain immunity from prosecution.[4] Alaska Statute 23.20.070 clearly falls within this latter category.

**3.** *See United States v. Monia*, 317 U.S. 424, 425–30, 63 S.Ct. 409, 409–12, 87 L.Ed. 376 (1943) (interpreting former immunity provision of the Sherman Act, 15 U.S.C.A. § 32, and finding that express assertion of privilege against self-incrimination is not required where language in statute does not require it); *People v. King*, 66 Cal.2d 633, 58 Cal.Rptr. 571, 427 P.2d 171 (1967) (interpreting California's Insurance Code Section 12924(b) and concluding, "where one is compelled to testify the immunity attaches without the assertion of the privilege against self-incrimination in the absence of a statutory requirement for such an assertion."); *People v. Buffalo Gravel Corp.*, 195 N.Y.S. 940, 945–46 (N.Y. Extra. Trial Term 1922) (scope of New York Housing Commission Resolution granting immunity for testimony sufficiently broad so as to negate necessity for asserting privilege against self-incrimination).

**4.** *See United States v. Abrams*, 357 F.2d 539, 549 (2d Cir.1966) (defendant did not secure immunity under former immunity subsection of 15

U.S.C. § 77 (which included "after having claimed privilege" clause) by testifying before an examiner of the Securities and Exchange Commission, where defendant never made contemporaneous claim of privilege when he testified); *People v. Skelton*, 109 Cal.App.3d 691, 167 Cal. Rptr. 636, 646 (1980) (finding that the plain language of California's Corporations Code Section 25531(e) "clearly requires the privilege be claimed if immunity is to be obtained"); *People v. Dist. Court of Arapahoe County*, 894 P.2d 739, 743 (Col.1995) (same). *See also* 18 U.S.C.A. § 6002 (West 2006) (federal general immunity statute that supplemented previous federal immunity statutes requires witness to assert privilege before immunity can attach). *Cf. 7455 Inc. v. Oregon Liquor Control Comm'n*, 310 Or. 477, 800 P.2d 781, 783, 786 (1990) (statute that authorizes transactional immunity for compelled testimony in liquor licensing proceeding does not provide for automatic right to immunities listed in statute based on issuance of subpoena by Liquor Control Commission; witness must in-

It is uncontested that Rivers did not assert his privilege against self-incrimination at any time during his interview with Investigator Marley. The statute therefore offered him no protection.

*Why we conclude that Judge Wolverton erred in finding that Rivers's statements were involuntary*

Our discussion of this issue begins with the United States Supreme Court's decision in *Minnesota v. Murphy*.[5] Murphy was given a suspended sentence on a sex-related charge and was placed on probation. The conditions of his probation required him to participate in a treatment program for sex offenders, report to his probation officer as directed, and be truthful with the probation officer "in all matters."[6] Murphy was told that a violation of any of these conditions could result in the revocation of his probation.

A counselor at Murphy's sex offender treatment center informed Murphy's probation officer that Murphy had admitted, during the course of treatment, that he had committed a rape and murder approximately seven years previously. The probation officer notified the police and set up a meeting with Murphy. During the meeting, Murphy admitted to the rape and murder. At the conclusion of the meeting, the probation officer told Murphy she had a duty to relay the incriminating information to the police and encouraged him to turn himself in. But she permitted Murphy to leave her office.

When Murphy was later indicted for murder, he moved to suppress the statements he made to his probation officer on the ground that his statements were obtained in violation of his privilege against self-incrimination under the Fifth and Fourteenth Amendments to the United States Constitution.[7] The Minnesota Supreme Court ordered Murphy's statements suppressed under reasoning simi-

lar to that advanced by Judge Wolverton in Rivers's case. The Minnesota Supreme Court concluded that Murphy had not been in custody, and generally recognized the principle that a person must invoke his right to remain silent in order to exercise it. But the court found that Murphy's statements had been obtained in violation of his right against self-incrimination because he was compelled to attend the meeting with his probation officer and was under a court order to respond truthfully to the probation officer's questions. The Minnesota Supreme Court pointed out that the probation officer had substantial reasons to believe that Murphy's answers would be incriminating. The court concluded that the probation officer should have warned Murphy of his privilege against self-incrimination.[8]

The United States Supreme Court reversed. The Court first held that the fact that Murphy was required to appear and answer questions truthfully "did not in itself convert Murphy's otherwise voluntary statements into compelled ones."[9] The Court pointed out that Murphy stood in no different a position than a witness who was called to testify at trial or before a grand jury. The witness would be compelled to appear and testify truthfully unless he validly invoked the privilege against self-incrimination. Recognizing the general rule, the Court stated: "[T]hus it is that a witness confronted with questions that the government should reasonably expect to elicit incriminating evidence ordinarily must assert the privilege rather than answer if he desires not to incriminate himself."[10]

The Court then discussed the two exceptions to the general rule that a person must invoke the right against self-incrimination. The first exception applies when suspects are subject to custodial interrogation.[11] The Court pointed out that *Miranda v. Arizona*[12]

voke right not to testify and only post-invocation order to testify triggers immunity under statute).

**5.** 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984).

**6.** *Id.* at 422, 104 S.Ct. at 1139.

**7.** *Id.* at 425, 104 S.Ct. at 1141.

**8.** *Id.*

**9.** *Id.* at 427, 104 S.Ct. at 1142.

**10.** *Id.* at 429, 104 S.Ct. at 1143.

**11.** *Id.* at 429–30, 104 S.Ct. at 1143–44.

**12.** 384 U.S. 436, 467, 86 S.Ct. at 1602, 1624, 16 L.Ed.2d 694 (1966).

required the exclusion of incriminating statements that were obtained during custodial interrogation of suspects in police custody unless the suspect was informed of his *Miranda* rights and waived them.[13] But the Court qualified this exception, noting that "this extraordinary safeguard 'does not apply outside the context of the inherently coercive custodial interrogations for which it was designed.'"[14] The Court observed that Murphy was not under arrest and was free to leave at the end of the meeting.[15] The Court determined that Murphy was not in custody and was not entitled to a *Miranda* warning.[16] The Court concluded that Murphy could not claim the benefit of the *Miranda* exception to the general rule that the Fifth Amendment privilege is not self-executing.[17]

The Court then turned to the second exception to the general rule that a person must claim the privilege against self-incrimination in order to exercise it. The privilege becomes self-executing when the assertion of the privilege is penalized so that the defendant does not have a free choice to remain silent and is compelled to give incriminating testimony.[18] The Court held that the fact that Murphy was required to attend the meeting and truthfully answer the questions of the probation officer, who anticipated that Murphy would give incriminating answers, was not sufficient compulsion to find that Murphy was coerced into giving up his right against self-incrimination.[19] The Court pointed out that "Murphy was not expressly informed during the crucial meeting with his probation officer that an assertion of the privilege would result in the imposition of a penalty."[20] The Court stated that "[i]f Murphy did harbor a belief that his probation might be revoked for exercising the Fifth

Amendment privilege, that belief would not have been reasonable."[21]

The reasoning of *Murphy* directs our conclusion in this case. If anything, Murphy faced greater coercive pressures than did Rivers. Murphy was required to attend the meeting, was required to answer questions truthfully, and faced substantial criminal penalties for his failure to comply with his probation conditions. Like Murphy, Rivers was not in custody for *Miranda* purposes. There is no suggestion that Investigator Marley had any authority to arrest Rivers or any intention to do so. It appears to have been clear that Rivers was going to walk out of the Employment Security Division office at the end of the interview, which he did. Applying the standards set out by the Court in *Murphy*, Rivers's failure to exercise his right against self-incrimination was not coerced and therefore the privilege was not self-executing. Investigator Marley never threatened Rivers with the loss of his unemployment benefits if Rivers exercised his Fifth Amendment rights. As the Supreme Court pointed out, a witness in a trial is required to appear and to testify truthfully. If the witness wants to exercise his rights against self-incrimination, the witness is required to explicitly do so. Rivers was not under any more compulsion than was Murphy or a witness in a trial. Because he did not affirmatively assert his right against self-incrimination, and because this failure is not excused by any exception to the general rule requiring that he do so, Rivers forfeited the privilege and is not entitled to suppression of his statements.

*Conclusion*

We conclude that Judge Wolverton erred in granting Rivers's motion to suppress. We

13. *Murphy*, 465 U.S. at 430, 104 S.Ct. at 1143–44 (*Miranda* requires exclusion of incriminating statements obtained during custodial interrogation unless suspect fails to claim Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert that right).

14. *Id.* at 430, 104 S.Ct. at 1144 (quoting *Roberts v. United States*, 445 U.S. 552, 560, 100 S.Ct. 1358, 1364, 63 L.Ed.2d 622 (1980)).

15. *Id.* at 430 n. 5, 104 S.Ct. at 1144 n. 5.

16. *Id.* at 430, 104 S.Ct. at 1144.

17. *Id.* at 434, 104 S.Ct. at 1145.

18. *Id.* at 435, 104 S.Ct. at 1146.

19. *Id.* at 437, 104 S.Ct. at 1147.

20. *Id.* at 438, 104 S.Ct. at 1148.

21. *Id.*

accordingly reverse that order. We remand the case to the superior court for further proceedings.

REVERSED and REMANDED.

MANNHEIMER, Judge, concurring.

I write separately to clarify and emphasize the core of our decision.

The superior court ruled that Rivers's statements to the Division of Employment Security investigator were "involuntary" for constitutional purposes because Rivers was compelled by law to attend the interview and answer questions concerning his eligibility for unemployment benefits—"compelled" in the sense that, if he declined to attend the interview or to answer the investigator's questions, he risked the loss of his benefits.

The superior court's analysis is incorrect. The fact that a person is compelled by law to attend a hearing and answer questions does not mean that the person's resulting statements are involuntary—otherwise, all testimony given in court by witnesses under subpoena would be involuntary. This point of law is explained by Professor Wigmore:

> [When a] witness is on the stand and an incriminating fact, relevant to the issue, is desired to be proved through him, the question may be asked, and it is for [the witness] then to [raise] a claim of privilege[.] ... [T]he witness cannot at the very ... threshold set up the privilege of not answering possible questions as a valid reason for refusing to *obey the process* of [the] court summoning him to appear.

John Henry Wigmore, *Evidence in Trials at Common Law* (McNaughton rev'n 1961), § 2268, Vol. 8, pp. 402 & 405 (emphasis in the original).

Thus, when determining whether a person's statements are voluntary or involuntary, the issue is not whether the person was under compulsion to attend the proceeding and answer questions. Rather, the issue is whether the person was coerced to surrender their privilege against self-incrimination.[1]

If a person is summoned to a court proceeding or agency hearing, and if the person is questioned in such a way that the person's answers might tend to incriminate them, then it is the person's right to assert the privilege against self-incrimination and refuse to answer. But if the person fails to assert this privilege and instead answers the questions, the privilege is waived and the answers are considered "voluntary" for constitutional purposes—even though the person is never explicitly warned that they have the legal right to refuse to give potentially incriminating answers.[2]

Rivers answered the questions put to him, and he never interposed the privilege against self-incrimination. Accordingly, his statements are presumed to be voluntary.[3]

As the majority opinion notes, there are two exceptions to the rule that a person's failure to assert the privilege against self-incrimination will be deemed a waiver of the privilege.

The first exception is the *Miranda* rule, which applies to people who are subjected to custodial interrogation. Because of the implicitly coercive aspects of police custody, suspects in custody must be explicitly informed of their right not to incriminate themselves, and they must waive this right before the interrogation proceeds. But Rivers was not in custody for *Miranda* purposes.

The second exception applies to situations where a person's very assertion of the privilege against self-incrimination triggers a penalty. In such instances, the person's statements will be deemed involuntary because the person has been unlawfully deterred from asserting the privilege.[4]

---

**1.** *Minnesota v. Murphy*, 465 U.S. 420, 434–35, 104 S.Ct. 1136, 1146, 79 L.Ed.2d 409 (1984); *Beaver v. State*, 933 P.2d 1178, 1181 (Alaska App.1997).

**2.** *Murphy*, 465 U.S. at 427–28, 104 S.Ct. at 1142; *Beaver*, 933 P.2d at 1181; *Williams v. State*, 928 P.2d 600, 606–07 (Alaska App.1996).

**3.** *See Beaver*, 933 P.2d at 1181.

**4.** *Murphy*, 465 U.S. at 434–35, 104 S.Ct. at 1146; *Beaver*, 933 P.2d at 1181.

But for purposes of this exception, one must distinguish situations where a person will be penalized for the very act of asserting the privilege (*e.g.*, the person will lose their job if they assert the privilege, regardless of the other evidence in the case) from situations where a person is free to assert the privilege but they then run the risk that, based on the remaining evidence, the court or administrative agency will decide the case against them. The exception applies only to the former situation, not the latter.[5]

The United States Supreme Court discussed this point of law in *Minnesota v. Murphy*.[6] Murphy was a probationer who was summoned to meet with his probation officer and answer questions about his activities; the probation officer anticipated that Murphy's answers (if truthful) would be self-incriminating. Murphy answered the probation officer's questions, and those answers were later used against him in a criminal prosecution. On appeal, Murphy argued that his answers were "compelled" within the meaning of the Fifth Amendment.

In rejecting this claim, the Supreme Court carefully distinguished (a) Murphy's legal obligation to meet with his probation officer and answer the officer's questions truthfully from (b) Murphy's ability to invoke the Fifth Amendment if he believed that truthful answers would tend to incriminate him. The Court declared that even though Murphy "was under legal compulsion to attend the meeting [with his probation officer] and to answer truthfully the questions of [the] probation officer",

[s]uch compulsion ... is indistinguishable from that felt by any witness who is required to appear and give testimony[.] ... [I]t is insufficient to excuse Murphy's failure to exercise the [Fifth Amendment] privilege in a timely manner.

... Murphy's probation condition proscribed only false statements; it said noth-

ing about his freedom to decline to answer particular questions[,] and [it] certainly contained no suggestion that his [continued] probation was conditional on his waiving his Fifth Amendment privilege[.] ...

... There is no direct evidence that Murphy confessed because he feared that his probation would be revoked if he remained silent. Unlike the police officers in *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), Murphy was not expressly informed ... that an assertion of the privilege would result in the imposition of a penalty....

[And if] Murphy did harbor a belief that his probation might be revoked for exercising the Fifth Amendment privilege, that belief would not have been reasonable. Our decisions have made clear that [a] State could not constitutionally carry out a threat to revoke [a person's] probation for the legitimate exercise of the Fifth Amendment privilege.... Indeed, in its brief in this Court, the State [of Minnesota] submits that it would not, and legally could not, revoke probation for refusing to answer questions calling for information that would incriminate in separate criminal proceedings.

... We have not been advised of any case in which Minnesota has attempted to revoke probation merely because a probationer refused to make nonimmunized disclosures concerning his own criminal conduct; and, in light of our decisions proscribing threats of penalties for the exercise of Fifth Amendment rights, Murphy could not reasonably have feared that the assertion of the privilege would have led to revocation.

*Murphy*, 465 U.S. at 437–39, 104 S.Ct. at 1147–48.

This Court applied this same principle in *John v. State*, 35 P.3d 53 (Alaska App.2001), where we rejected a defendant's contention

---

**5.** *See Garrity v. New Jersey*, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967) (holding that it is unlawful to use incriminating answers given by a police officer after the officer was deterred from asserting the Fifth Amendment privilege by warnings that, if he asserted the privilege, he would be fired). *See also Gardner v. Broderick*, 392 U.S. 273, 279, 88 S.Ct. 1913,

1916, 20 L.Ed.2d 1082 (1968) (holding that it is unlawful to fire a police officer simply for invoking the Fifth Amendment privilege).

**6.** 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984).

that his statements to a pre-sentence investigator were involuntary because he "was presented with the choice of either fully answering the questions in the presentence worksheet or risking an unjust sentence". *Id.* at 62–63.

Rivers found himself in an analogous situation. It may be true that, based on the information available to the Division of Employment Security, the Division might well have decided to terminate Rivers's unemployment benefits (and to initiate legal action against him for his earlier collection of unauthorized benefits) if Rivers had invoked his privilege against self-incrimination and had thereby declined to offer any explanation of his situation. But there is nothing in the record to suggest that the Division would have terminated Rivers's benefits (or imposed any other penalty on him) based simply on the fact that he invoked the privilege. Thus, the Division did not infringe Rivers's constitutional privilege against self-incrimination.

(Alternatively, if Rivers had asserted his privilege, AS 23.20.070 empowered the Division to insist on Rivers's answering their questions despite his claim of privilege—in

which case, under the statute, Rivers would have received immunity from prosecution for his answers. Again, Rivers's constitutional rights would not have been abridged—because immunity is a lawful substitute for the privilege against self-incrimination.[7])

In sum, even though Rivers may have been obliged to attend the Division of Employment Security interview, and to answer the questions put to him by the state investigator, this is not a basis for concluding that Rivers's answers were "compelled" or "involuntary". Rivers's answers would be compelled or involuntary only if he was threatened with a penalty for asserting his privilege against self-incrimination and refusing to divulge potentially incriminating information. This did not happen.

The superior court therefore committed error when it suppressed Rivers's statements to the investigator.

---

**7.** *See Murphy v. Waterfront Comm'n of New York Harbor,* 378 U.S. 52, 79, 84 S.Ct. 1594, 1609, 12 L.Ed.2d 678 (1964) ("[A] witness may not be compelled to give testimony which may be incriminating ... unless the compelled testimony and its fruits cannot be used in any manner by ... officials in connection with a criminal prosecution against him."); *Hazelwood v. State,* 836 P.2d 943, 952 (Alaska App.1992) ("Because the ultimate aim of the ... privilege is to assure that no compelled statement will be used against the accused in a criminal case, the Supreme Court has long recognized that the ... protection against compulsory elicitation of potentially incriminating statements ... may be properly invaded by the government, but only in exchange for a guarantee that the ... compelled statements or evidence derived therefrom ... will not be [used against the person].").