Richard Michael SKREPICH, Appellant,

v.

STATE of Alaska, Appellee.

No. A–1786.

Court of Appeals of Alaska.

July 31, 1987.

Craig J. Tillery, Asst. Public Defender, Palmer, and Dana Fabe, Public Defender, Anchorage, for appellant.

Steven H. Morrissett, Acting Dist. Atty., Palmer, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Richard Michael Skrepich was convicted after entering a plea of *nolo contendere* to

one count of sexual abuse of a minor in the second degree, a class B felony. AS 11.41.-436. Superior Court Judge Peter A. Michalski sentenced Skrepich to a maximum term of ten years' imprisonment. In addition, Judge Michalski ordered Skrepich to refrain from engaging in any direct or indirect contact with the victim of his offense. On appeal, Skrepich challenges the ten-year term as excessive and contends that the no-contact order is invalid. We reverse.

In 1985, Skrepich operated a karate school in Wasilla. He used the name Richard Michaels as an alias. Skrepich became romantically involved with one of his female karate pupils, C.S. C.S. was fourteen years old when she first met Skrepich. Skrepich was thirty-seven years old. Skrepich told C.S. that he was a millionaire and that he had large amounts of money invested in Florida in silver and real estate. C.S. initially regarded Skrepich as a father figure, but their relationship soon began to change. Skrepich bought flowers and gifts for C.S. and gave her spending money for school. Skrepich was aware that C.S.'s mother was having financial difficulty, and he purchased clothing for C.S. and items such as contact lenses that he knew C.S.'s mother could not afford. Skrepich declared that he wanted to marry C.S. and, at one point, deposited $100 as a downpayment on a wedding ring at a jewelry store. In approximately July 1985, after turning fifteen years of age, C.S. engaged in sexual intercourse with Skrepich for the first time. Thereafter, their sexual relationship continued through December.

In September of 1985, C.S.'s friend—fifteen-year-old G.H.—attended a birthday party for Skrepich. While at the party, Skrepich, C.S. and G.H. were in a hot-tub together; C.S. and G.H. masturbated Skrepich, and Skrepich penetrated G.H.'s vagina with his fingers. G.H. later reported the incident to a foster parent, who notified the authorities.

On December 26, 1985, following an investigation, Skrepich was arrested on two charges of second-degree sexual abuse of a minor, the first charge related to his ongoing sexual activity with C.S. The second was for sexually penetrating G.H. Upon arrest, Skrepich gave his name as Richard Michaels and provided the police with a fictitious social security number. Skrepich falsely told the police that he had formerly been employed in the securities and commodities industry in California, New York, and Florida. Skrepich's true identity was eventually learned through fingerprint records. Upon discovery of Skrepich's correct identity, the police learned that there was an outstanding warrant for his arrest in Ohio on charges of rape and corruption of a minor.

Investigation into Skrepich's activities also disclosed that, during the entire course of his liaison with C.S., Skrepich had been living in Willow, in the home of another woman, B.B., with whom Skrepich was involved in an ongoing relationship. Skrepich never revealed his liaison with C.S. to B.B., who learned about it only after Skrepich's arrest.

Skrepich eventually pled no contest to the sexual abuse charge relating to C.S. In return for his plea, the prosecution dismissed the charge involving G.H.

At the sentencing hearing, the state attempted to establish that Skrepich's conduct with C.S. and G.H. was part of a long-standing pattern of sexual abuse by Skrepich against minors. To this end, the state presented testimony from M.S. and C.H., sisters who had been named as the victims in the rape charges pending against Skrepich in Ohio.

M.S. testified that she was ten years old when she first met Skrepich, and that C.H. was eight. Skrepich was their mother's boyfriend and lived in their home from approximately 1975 to 1981. According to M.S. and C.H., Skrepich would usually stay home while their mother was at work; the girls were required to call him daddy. Skrepich began sexually abusing M.S. when she was about thirteen years of age. He began abusing C.H. when she was

about nine or ten. He forced the girls to have oral, anal and genital intercourse. In addition, he frequently engaged in physical abuse of the children.

M.S. and C.H. also testified that they were aware of three other children who were sexually abused by Skrepich during this period of time. The girls' mother ultimately learned of Skrepich's conduct and reported it. Skrepich moved out of their home and left Ohio shortly before being indicted there in 1981.

J.C., the mother of C.S., also testified at the sentencing hearing. J.C. believed that Skrepich had "messed up [C.S.'s] mind." According to J.C., her daughter had been especially vulnerable to Skrepich because C.S. had been without a father figure for several years. J.C. also testified that Skrepich had assured her there was no sexual attachment between himself and her daughter. J.C. stated that even after Skrepich had been arrested and incarcerated pending trial, he continued to send flowers and gifts to C.S., and persisted in attempting to contact her. J.C. made it clear that she wanted the court to put an end to the contact between Skrepich and her daughter.

Debbie Haynes, C.S.'s therapist, further testified that it was typical for offenders who sexually abused children to engage in an initial "grooming" process by gaining the trust of the child and her parents. In a letter submitted to the court as an attachment to the presentence report, Haynes wrote:

> My assessment is that [C.S.] has been taken advantage of and it is going to be painful and confusing for her to lose a man who seems to have represented both a lover and a father figure. Due to the alleged promises made by Skrepich, [C.S.] formed a deep sense of commitment to him. [C.S.] appeared to be obsessed with Skrepich and the promises he made. This seems to have prevented [C.S.] from realizing that she is a victim. She has repeatedly stated that she expects to continue a relationship with Skrepich in the future on a long-term basis. These unrealistic expectations have made it difficult for [C.S.] to work in therapy.

Two other witnesses were presented by the state at the sentencing hearing. The mother of two boys who had been in Skrepich's karate class testified that Skrepich had told her that he had no intention of marrying C.S. and that what happened to C.S. after he left would be her problem. In addition, B.B., with whom Skrepich had lived during his relationship with C.S., testified that she had been unaware of Skrepich's involvement and that she felt she had been "duped" and "used" by Skrepich.

In response to the testimony of the state's witnesses, the defense called C.S. to testify in Skrepich's behalf. C.S.—sixteen years of age at the time of her testimony—said she did not believe that Skrepich's conduct toward her amounted to sexual abuse. C.S. stated that her affair with Skrepich was a voluntary one, that Skrepich had always been good to her, and that he had never hurt her. C.S. thought her relationship with Skrepich had been beneficial for her and had improved her self-image. She said that she wanted to continue seeing Skrepich and that she still planned to marry him after she turned eighteen years of age.

In his own remarks to the court, Skrepich likewise claimed that he had genuinely fallen in love with C.S. He denied any psychologically or sexually abusive conduct toward her and characterized his relationship with her as honorable.

In imposing sentence, Judge Michalski flatly rejected Skrepich's characterization of the offense. Based on the deceptiveness of Skrepich's conduct and on his prior misconduct in Ohio, Judge Michalski found that Skrepich's chances for rehabilitation were "almost nil." Noting that Skrepich had apparently preyed on young girls throughout his adult life, the judge concluded that Skrepich was a dangerous offender and that primary emphasis in sentencing him should be placed on the goal of

isolation. Judge Michalski found, moreover, that Skrepich was a worst offender because he had violated the trust inherent in his status as C.S.'s teacher.

Despite the fact that Skrepich was a first offender, the judge imposed the maximum sentence of ten years. In addition, at the state's request, the judge expressly ordered Skrepich to refrain from any direct or indirect contact with C.S. during his term of imprisonment.

On appeal, Skrepich disputes Judge Michalski's conclusion that Skrepich was incapable of rehabilitation and that he therefore deserved to be classified as a worst offender. Emphasizing that he has never previously been convicted of a crime, Skrepich contends that imposition of the maximum sentence was error. He argues that the rule of *Austin v. State*, 627 P.2d 657 (Alaska App.1981), was violated.

In *Austin*, we held:

Normally a first offender should receive a more favorable sentence than the presumptive sentence for a second offender. It is clear that this rule should be violated only in an exceptional case.

*Id.* at 657–58. In subsequent cases, we have indicated that, for purposes of the *Austin* rule, an "exceptional case" is one in which statutory aggravating factors could be proved or referral to the three-judge panel for imposition of an increased term would be justified if presumptive sentencing applied. *See Maal v. State*, 670 P.2d 708, 710 (Alaska App.1983); *Peetook v. State*, 655 P.2d 1308, 1310 (Alaska App. 1982); *Sears v. State*, 653 P.2d 349, 350 (Alaska App.1982).

■ In the present case, Skrepich was a first felony offender convicted of a class B felony. Because of Skrepich's status as a first offender, no presumptive term applied to his case. Had he previously been convicted of a felony, he would have been subject, under AS 12.55.125(d), to a presumptive term of four years. Absent specific statutory aggravating factors or extraordinary circumstances warranting referral to the three-judge panel, the four-year presumptive term could not have been exceeded. The obvious aim of the *Austin* rule, in this context, is to assure that Skrepich was not treated more harshly as a first offender than he would have been treated as a second offender.

There is ample evidence of aggravated circumstances to provide such assurance in the present case. As established by the testimony of M.S. and C.H., Skrepich had a long-standing history of sexually abusive conduct toward children. His past misconduct appears to be even more serious in nature than his current offense. At the time of his current offense, Skrepich was a fugitive from Ohio, where charges related to his past misconduct were pending.

In addition, Skrepich was convicted for conduct that involved repeated acts of sexual abuse occurring over a period of several months and involving more than one victim. In committing the offense, Skrepich appears to have abused a position of trust as C.S.'s karate instructor. He committed the offense by relying on a pattern of misrepresentation and deception that enabled him to gain the confidence of C.S. and her mother. Skrepich's false statements to the police following his arrest, his persistent efforts to maintain contact with and influence over his victim, and his steadfast insistence that his relationship with C.S. was formed in good faith and was not abusive are all factors that reflect poorly on his prospects for rehabilitation.

If Skrepich had been subject to presumptive sentencing, these circumstances, considered in their totality, would have been sufficiently extraordinary to warrant a substantial increase in the applicable presumptive term. Accordingly, we have little difficulty in concluding that Skrepich's case qualifies as an exceptional one under *Austin*, and that the imposition of a sentence in excess of the four-year presumptive term for second offenders did not violate the *Austin* rule.

■ A closer and more difficult question is whether Skrepich's background and the

circumstances of the present case are so serious as to justify the imposition of a maximum sentence. We conclude that neither Skrepich's background nor his current offense can support the conclusion that he is a worst offender. The maximum sentence was therefore not justified.

In deciding to impose the maximum sentence, Judge Michalski relied primarily on his conclusion that Skrepich was incapable of rehabilitation and could not personally be deterred. The judge thus gave primary emphasis to the need to protect the public by isolating Skrepich from the community. While the judge also indicated that a lengthy sentence would serve the sentencing goals of general deterrence and community condemnation, it seems clear that these goals could not, in themselves, support the imposition of a maximum, ten-year term for a first offender convicted of a class B felony. *See Pears v. State*, 698 P.2d 1198, 1204–05 (Alaska 1985) (holding that a term of substantially less than twenty years would serve the objectives of general deterrence and community condemnation in the case of a first offender convicted of second-degree murder, an unclassified felony). The appropriateness of the maximum term imposed thus necessarily hinges on the validity of Judge Michalski's conclusion that Skrepich cannot be personally deterred or rehabilitated. Given Skrepich's status as a first offender, we believe that the sentencing court's decision to abandon rehabilitation and individual deterrence as realistic sentencing goals was premature.

In *Maal v. State*, 670 P.2d 708 (Alaska App.1983), we considered a similar issue. Maal was convicted of burglary in the first degree, a class B felony. The circumstances of the specific crime were aggravated in some respects and mitigated in others. Maal had a prior felony record, but his prior convictions had been entered too long before the commission of the current offense to be considered for presumptive sentencing purposes. Thus, Maal was nominally a first offender. *Id.* at 709–10.

Despite Maal's first-offender status, the sentencing court imposed a maximum term. The court concluded that Maal was a worst offender and that his isolation was necessary for the protection of the public. In reaching this conclusion, the court relied on Maal's record of prior convictions, as well as on a series of psychological evaluations that had been prepared in connection with Maal's past and current cases. The evaluations uniformly depicted Maal as suffering from an anti-social personality, and they unanimously concluded that Maal's prognosis for treatment was poor. *Id.* at 711–12.

On appeal, we held that Maal's prior record, his poor prognosis for rehabilitation, and the aggravated circumstances of his current offense were all factors that the court could properly consider and rely on in deciding upon an appropriate sentence. We further held that these factors justified a sentence in excess of the four-year *Austin*-rule limit. *Id.* at 711.

We nevertheless concluded that the sentencing court erred in disregarding the fact that Maal was a first offender for presumptive sentencing purposes and the fact that certain circumstances surrounding his offense were mitigated. We stated, in relevant part:

> However, we do not believe that the maximum sentence of ten years to serve … was justified. *See State v. Wortham*, 537 P.2d 1117, 1120 (Alaska 1975). While we believe that [the sentencing court] could properly take into account the likelihood that Maal would again engage in a pattern of dangerous conduct, it is necessary to keep in mind the concomitant need to judge the seriousness of Maal's offense as compared with other offenses of the same class. In short, the sentence must ultimately be tailored to fit the crime committed in the specific case, and inordinate emphasis must not be placed on predictions of possible future misconduct. AS 12.55.005 makes it clear that this is a central tenet of the sentencing provisions contained in the Revised Alaska Criminal Code.

. . . .

While Maal's background, his psychological condition at the time of sentencing, and his serious conduct in this case are sufficient to warrant a severe sentence, we believe that a maximum ten-year term gives undue prominence to speculation as to Maal's "future behavior." All of the circumstances, both favorable and unfavorable, are significant in the determination of an appropriate sentence. A number of specific factors reflect favorably upon Maal. Yet imposition of a maximum sentence in this case would require that these factors be virtually ignored.

*Maal,* 670 P.2d at 711–12.

Here, as in *Maal,* the specific offense at issue involved both aggravating and mitigating circumstances. Although, on the one hand, Skrepich was undeniably dishonest and abused the trust inherent in his role as C.S.'s karate instructor, it must be conceded, on the other hand, that there is no evidence of any assaultive conduct or of any physical or psychological coercion or intimidation. At the time of the offense, moreover, C.S. was fifteen years old—the upper age limit included in the definition of the offense of second-degree sexual abuse. *See* AS 11.41.436(a)(1).

More significantly, Skrepich, like Maal, was a first offender for presumptive sentencing purposes. In *Maal,* we held that the defendant's first-offender status could not be disregarded entirely, because the lengthy period between Maal's current offense and his past convictions indicated at least some potential for rehabilitation. We found that, under the circumstances, reliance on the psychological prognosis of future danger gave "undue prominence to speculation as to Maal's 'future behavior.'" *Maal,* 670 P.2d at 712.

This same rationale applies to Skrepich, albeit for slightly different reasons. Skrepich's first-offender status stems not from a lengthy period of good conduct between his past and current offenses, but rather from the fact that he has not previously been convicted of the past misconduct. We assume, for purposes of argument, that Judge Michalski, in the limited context of a sentencing hearing, was perfectly capable of making an accurate determination of Skrepich's guilt with respect to the prior offenses. Nevertheless, the fact that Skrepich had not been convicted for his past criminal conduct cannot be disregarded, for it is significant in two respects.

First, the entry of a judgment of conviction against a person who has been accused of a crime serves to provide formal and unequivocal notice to the accused that his conduct has not conformed to the requirements of the law and is punishable as a crime. By the same token, the conviction provides assurance that the accused has been offered assistance in reforming his conduct if he is incapable of achieving rehabilitation on his own. *See State v. Rastopsoff,* 659 P.2d 630, 640 (Alaska App.1983). Unless formally charged and convicted, an offender may have little motivation or ability to change. Consequently, predicting that an offender is incapable of rehabilitation and will continue to commit crimes is necessarily rendered more speculative when the offender's past misconduct has not been the subject of a prior conviction.

Second—entirely apart from its role in providing an opportunity for rehabilitation—the entry of a formal judgment of conviction, when combined with a sentence of imprisonment, can serve to deter future similar misconduct by an offender, even one who might not otherwise be amenable to rehabilitation. Again, any prediction that an offender is incapable of being deterred and must be isolated for the protection of the community is necessarily rendered speculative when the offender has never previously been subjected to any substantial sentence of incarceration. *See Rastopsoff,* 659 P.2d at 634–35. In this regard, we have repeatedly emphasized that, in all but the most serious categories of cases, a person should not normally be characterized as a dangerous offender—that is, as an offender whose isolation for

the maximum permissible term is necessary for the protection of the public—unless that person has previously been convicted of crimes for which a sentence involving at least one full year of incarceration was imposed. *See Ecklund v. State,* 730 P.2d 161 (Alaska App.1986); *Wood v. State,* 712 P.2d 420 (Alaska App.1986); *State v. Andrews,* 707 P.2d 900, 917 (Alaska App.1985), *aff'd,* 723 P.2d 85 (Alaska 1986); *Bolhouse v. State,* 687 P.2d 1166, 1176 (Alaska App.1984); *Viveros v. State,* 633 P.2d 289, 291 (Alaska App.1981). Our decisions comport with Standard 18–4.4(c) of the ABA Standards for Criminal Justice, which defines "habitual offender" as one who has been convicted of at least two prior felonies, committed on different occasions, within five years of the present offense, and who has previously served a sentence in excess of one year. III *Standards for Criminal Justice* § 18–4.4(c) (1982).

Here, despite the uncontroverted evidence of Skrepich's past misconduct, the absence of any prior conviction precludes us from predicting with any degree of confidence that he is in fact incapable of rehabilitation and cannot be deterred.[1] Under the circumstances, the sentencing court's abandonment of rehabilitation and personal deterrence as sentencing goals was unwarranted, and its imposition of a maximum sentence was clearly mistaken. *McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974).

In reaching this conclusion, we emphasize that, while Skrepich's past offenses could certainly be taken into account by the sentencing court, and while they justify a significant increase in his sentence, it was neither a legitimate nor a permissible goal of sentencing in the present case to punish Skrepich for his past crimes. To the extent that Skrepich's past misconduct reflected on his prospects for rehabilitation and on the seriousness of his conduct in the present case, the court was entitled to consider any verified information or evidence relating to that misconduct. *Nukapigak v. State,* 562 P.2d 697, 701 (Alaska 1977), *aff'd on rehearing,* 576 P.2d 982 (Alaska 1978). Before Skrepich could be subjected to separate punishment for his prior acts, however, he was entitled to have his responsibility for those offenses decided by a jury based on proof establishing his guilt beyond a reasonable doubt. Skrepich can and presumably will be formally prosecuted on the other charges pending against him in Ohio. If and when he is convicted, he will be subject to separate punishment for those crimes.

Considering the totality of the circumstances involved in the present case, we conclude that, on remand, a sentence of not more than ten years with four years suspended should be imposed. In reaching this conclusion, we once again find guidance in *Maal v. State,* where we stated:

We hold that, on remand, the sentencing court should impose a sentence not in excess of ten years with four years suspended. This sentence, we believe, reflects an appropriate balance of applicable sentencing criteria. The sentence provides for a period of incarceration equivalent to the presumptive term for a third-time class B felony offender; we consider this a useful benchmark for cases in which nominal first offenders are convicted of crimes under circumstances that would justify referral to a three-judge sentencing panel if presumptive sentencing applied. *See, e.g., Qualle v. State,* 652 P.2d 481, 486 (Alaska App.

**1.** In this appeal, it is also significant that there was no psychological evaluation supporting the sentencing court's conclusion that Skrepich is incapable of being rehabilitated or deterred. *See Salud v. State,* 630 P.2d 1008, 1013–14 (Alaska App.1981) (remanding a maximum sentence for second-degree murder where no psychological evaluation was ordered and the sentence was based in part on assumptions concerning the defendant's psychological make-up). *See also Yu v. State,* 706 P.2d 348 (Alaska App.1985).

1982). A sentence of ten years with four years suspended will, we believe, be sufficient to assure that Maal remains in a structured institutional setting for a substantial length of time. The suspended portion of the sentence will provide a means of control and supervision over Maal and will also enable the court to impose a maximum term of incarceration if, after being released, Maal demonstrates a continued inability to conform his conduct to the demands of society and to the requirements of his probation.

670 P.2d at 712.

 The sentence imposed by the superior court is VACATED. This case is REMANDED to the superior court for imposition of a sentence not to exceed ten years with four years suspended.[2]

---

2. In light of our disposition, Skrepich's challenge to the validity of the superior court's order requiring him to refrain from contact with C.S. requires only brief comment at this juncture. Although we find no merit to the constitutional argument presented by Skrepich, we believe his jurisdictional argument raises a substantial issue. Our recent decision in *Benboe v. State,* 738 P.2d 356 (Alaska App.1987), makes it clear that the superior court had no authority—statutory or inherent—to impose a direct no-contact order against Skrepich as part of the punishment for the offense.

The state argues that the superior court's general authority to enter injunctions empowered it to enter the no-contact order as an independent equitable requirement of the judgment, and not as a component of the sentence. The state cites no authority for this proposition. We are aware of no statute expressly conferring jurisdiction on the court to issue an injunction under the circumstances of this case. Nevertheless, it could be argued that, where justified by specific evidence, the superior court has inherent equitable authority to issue an order precluding a criminal defendant from contact with his victim. *Cf. Siggelkow v. State,* 731 P.2d 57 (Alaska 1987) (upholding inherent equitable authority of the superior court to enter no-contact orders between parties in a divorce action, where justified by specific evidence). This possibility has not been discussed in the parties' briefs, and was not considered by the sentencing court. Because a remand for resentencing is necessary, we believe it preferable not to address the issue at this time. On remand, if the issue is not moot, the sentencing court should reconsider its no-contact order in light of *Benboe* and *Siggelkow.* In the event the court decides to re-impose a no-contact order, it should indicate its basis for concluding that it has authority to enter such an order, and it should make any appropriate factual findings supporting the order's issuance.