Edward TURPIN, Appellant,

v.

STATE of Alaska, Appellee.

No. A–4862.

Court of Appeals of Alaska.

March 3, 1995.

Rex Lamont Butler, Anchorage, for appellant.

James L. Hanley, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

Edward Turpin appeals his conviction and sentence for second-degree sexual abuse of a minor, AS 11.41.436(a)(2). We affirm.

The events underlying this appeal occurred in the summer and fall of 1991. Turpin periodically lived with his adult daughter. Turpin's daughter had a thirteen-year-old foster child named D.P., and one of D.P.'s closest friends was twelve-year-old K.B. On November 15, 1991, the Anchorage Police Department received a report that K.B. had been sexually abused by Turpin. A few days later, Investigator Linda Branchflower contacted K.B. K.B. acknowledged that she had been abused by Turpin.

According to K.B.'s subsequent testimony at Turpin's trial, she had been sexually abused while spending the night at D.P.'s house in the summer of 1991. Turpin, who was then forty-five years old, joined K.B. and D.P. on the hide-a-bed in the living room. K.B. testified that Turpin began to rub the legs of both girls. Despite K.B.'s requests that he stop, Turpin moved his hand up K.B.'s leg and, through her pajamas, grabbed and rubbed her genitals. K.B. removed Tur-

pin's hand from her body, then got up from the bed and began walking around. K.B. explained that she did not call her mother because she thought her mother was out for the evening, and she did not call a cab because she had no money. After several minutes, K.B. lay back on the bed in a fetal position. She did not sleep that night.

Turpin's attack on his conviction centers upon remarks that the prosecuting attorney made during opening statement. In his opening statement, the prosecutor summarized K.B.'s expected testimony of sexual abuse by Turpin: that K.B. would testify that Turpin "sat down on the bed", "began to rub [D.P.'s] legs", then "began to rub [K.B.'s] legs". The prosecutor spoke of K.B.'s fear and surprise at Turpin's conduct, "not only because she had no reason to believe he would do that, but in addition because [D.P.] was right there". The prosecutor then explained that D.P., who apparently witnessed the sexual abuse, might not testify at Turpin's trial:

> PROSECUTOR: [S]uffice it to say that [K.B.] never returned . . . to spend another night with [D.P.]. And unfortunate, too, the relationship between the two girls faded, not only because of this incident, but also because D.P. for some period of time has been institutionalized in A.P.I. where she is, and despite treatment remains, a very deeply disturbed young girl. Because of this, we're not sure whether or not [D.P.] is going to testify in this trial at all.

The prosecutor's statements about D.P. were supported by testimony presented during the State's case-in-chief. Investigator Branchflower testified that D.P. had been institutionalized at the Alaska Psychiatric Institute (A.P.I.) since the previous April and that she was a "deeply disturbed young girl". D.P. was in fact brought to the courthouse to testify, but the State rested its case without calling her, and Turpin did not call her either.

Turpin did not object to the prosecutor's opening remarks either at the time they were made or at any later point in the trial.

However, these remarks became a point of dispute after the jury returned its verdict.

Following the return of the verdict, counsel for both the State and the defense met with a number of jurors who wanted to discuss the case. During this post-trial discussion, two jurors apparently asked the prosecutor if Turpin was "known to have sexually abused other minors, and specifically D.P." According to the defense attorney's account of the conversation, these two jurors then indicated that they believed D.P.'s hospitalization at A.P.I. was probably not "caused by just normal family problems, but more probably by her having been abused by Mr. Turpin".

██ On the basis of this conversation, Turpin moved for a mistrial. He asserted that the jury had convicted him based on speculation about other crimes, and he further asserted that this speculation had been fueled by the prosecutor's remarks during opening statement, which Turpin now claimed were improper. Superior Court Judge Milton Souter denied Turpin's motion, and Turpin raises these claims again on appeal.

██ Under Alaska law, if a party believes that an occurrence at trial requires the court to declare a mistrial, the party must raise this issue before the jury returns its verdict. *Owens v. State*, 613 P.2d 259 (Alaska 1980). As the supreme court noted in *Owens*:

> An accused may not withhold an objection to [an event] occurring during a trial until an adverse verdict has been returned. This procedure would permit him to take a gambler's risk and complain only if the cards fell the wrong way.

*Owens*, 613 P.2d at 261, quoting *Mares v. United States*, 383 F.2d 805, 808 (10th Cir. 1967). We apply the same rule here: by failing to seek a mistrial until he heard the jury's verdict, Turpin waived his claim.

██ We recognize that when plain error occurs—when the fundamental fairness of the trial has been compromised—courts will overlook the tardiness of a mistrial motion.

*Owens,* 613 P.2d at 261. However, there was no plain error in Turpin's case. The central witness for the prosecution was K.B., who testified that her friend D.P. was present when Turpin sexually abused her. Had there been a question raised as to why D.P. was not testifying (when she had apparently witnessed the sexual assault on K.B.), the prosecution would have been able to introduce testimony to explain D.P.'s absence, testimony similar to that of Investigator Branchflower. Perhaps the trial judge would have exercised his authority under Alaska Evidence Rule 403 to exclude some of the details described by Inv. Branchflower, but Turpin's attorney did not object to Branchflower's testimony on this basis.[1] We note that the prosecutor did not state or suggest that D.P.'s hospitalization was attributable to Turpin. We do not find plain error.

 The question then becomes whether Turpin is entitled to a new trial if the jury used the prosecutor's proper remarks as the fuel for improper speculation about Turpin's possible other crimes. The answer is found in Alaska Evidence Rule 606(b), which strictly prohibits post-trial inquiry into the mental operations and the emotional reactions of jurors during the deliberative process:

> **Inquiry Into Validity of Verdict or Indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not be questioned as to any matter or statement occurring during the course of the jury's deliberations or to the effect of any matter or statement upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's

affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Turpin attempts to avoid this rule by arguing that the prosecutor's opening statement was improper and that it therefore constituted "extraneous prejudicial information [that] was improperly brought to the jury's attention". We reject Turpin's argument for two reasons. First, the prosecutor's opening statement was proper. Second, "extraneous" information refers to information that reaches the jury other than through the normal trial process; it does not refer to objectionable statements of counsel made during trial or objectionable testimony given at trial. *See* Stephen A. Saltzburg, Michael M. Martin, & Daniel J. Capra, *Federal Rules of Evidence Manual* (6th ed. 1994), Vol. 2, p. 777: "[A]fter [the United States Supreme Court's decision in *Tanner v. United States,* 483 U.S. 107, 116–127, 107 S.Ct. 2739, 2745–2751, 97 L.Ed.2d 90 (1987)], inquiry under [Federal Evidence] Rule 606(b) must be limited to influences outside the evidence presented at trial, such as prejudicial publicity, pressure placed on jurors from outside sources, use of extrajudicial information, and the like." (Footnote omitted.)

Turpin's interpretation of "extraneous" information would essentially gut Rule 606(b), since it would allow impeachment of a verdict whenever the jurors heard improper arguments of counsel, improperly admitted evidence, or any questions or answers to which objections were sustained. Because claims of such errors arise at practically every trial, virtually any jury verdict would be subject to inquiry under Turpin's suggested reading of Rule 606(b). We reject this reading of the rule.

We turn now to Turpin's sentencing arguments. Turpin was a first-felony offender convicted of a class B felony. *See* AS 11.41.436(b). Under this court's decision in *Austin v. State,* 627 P.2d 657, 657–58 (Alaska App.1981), Turpin was entitled to receive a sentence more favorable than the 4–year presumptive term enacted by the legislature for

---

1. Turpin's attorney did object when Branchflower began to relate what D.P.'s treating physician had said about her condition, and Turpin's objections were sustained.

second-felony offenders convicted of the same offense, *see* AS 12.55.125(d)(1), unless the State proved that his case was exceptional. To justify a sentence exceeding the normal *Austin* ceiling, the State sought to prove two of the aggravating factors listed in AS 12.55.155(c): (c)(21), that Turpin had "a criminal history of repeated instances of conduct violative of criminal laws, whether punishable as felonies or misdemeanors, similar in nature to the offense for which [he was] being sentenced", and (c)(18)(B), that Turpin "had engaged in the same or similar conduct involving ... another victim who was a minor".

■ Turpin first argues that aggravator (c)(21) can not apply to him because, as a first offender, he has no "criminal history". However, when AS 12.55.155(c)(21) speaks of a defendant's criminal history, this term includes acts that could have been charged as crimes, regardless of whether the defendant was ever prosecuted and convicted for those acts. *Fagan v. State*, 779 P.2d 1258, 1260 (Alaska App.1989).

Turpin next argues that Judge Souter should not have believed the allegations of sexual abuse made by D.P. at the sentencing hearing, as well as older allegations of sexual abuse made by Turpin's daughter L.H. Turpin points out that D.P. admitted making false accusations of sexual abuse against other adults, and he argues that D.P.'s allegations were "totally lacking in credibility". Turpin also points out that L.H.'s allegations of sexual abuse were made ten years before, and that L.H. (now an adult) recanted those allegations when she took the stand at Turpin's sentencing hearing.

However, Judge Souter was the finder of fact at Turpin's sentencing, and he was entitled to form his own conclusions concerning the credibility of the witnesses at that hearing. Judge Souter concluded that L.H. had been sexually abused by Turpin when she was a child and that L.H. had committed perjury at the sentencing hearing when she recanted her earlier allegations against Turpin. Judge Souter further concluded, after observing D.P.'s cross-examination and having reviewed two electronically-monitored telephone conversations in which Turpin indicated that he had engaged in sexual impro-

prieties with D.P., that D.P.'s allegations of sexual abuse were truthful. The judge therefore found that the State had proved the two aggravating factors by clear and convincing evidence.

We are to reverse Judge Souter's conclusions only if we find them to be clearly erroneous. *Lepley v. State*, 807 P.2d 1095, 1099 n. 1 (Alaska App.1991). On this record, we do not find Judge Souter's conclusions to be clearly erroneous.

■ Finally, we turn to Turpin's contention that his sentence is excessive. As noted above, Turpin was a first-felony offender convicted of a class B felony. In *State v. Jackson*, 776 P.2d 320 (Alaska App.1989), this court conducted an extensive survey of sentencing decisions involving first-felony offenders convicted of class B felonies, concluding that these cases fell into four distinct sentencing ranges. For a typical offender committing a typical or moderately aggravated offense, *Jackson* established a benchmark sentencing range of 1–4 years to serve. For an exceptionally aggravated offense, one involving significant statutory aggravating factors or other unusual aggravating circumstances, *Jackson* established a benchmark sentencing range of 4–6 years to serve. *Jackson*, 776 P.2d at 326–27.

Judge Souter sentenced Turpin to 9 years' imprisonment with 3 years suspended (6 years to serve). This sentence falls at the upper end of *Jackson*'s benchmark range for exceptionally aggravated offenses. Judge Souter's sentencing remarks show that he was aware of the *Jackson* benchmark ranges and that he consciously chose not to impose more than 6 years to serve. Nevertheless, such a sentence should not be imposed unless there is good reason to categorize Turpin's background and/or conduct as among the most aggravated within the group of first-offender class B felons.

As described above, Judge Souter found that Turpin had sexually abused not only K.B. but also his own daughter (a decade before) and, more recently, his daughter's foster child, D.P. Judge Souter also found that Turpin's exculpatory testimony at the sentencing hearing was "totally unbelievable"

and "contrived". The judge concluded that Turpin was "in a state of total denial" and that Turpin's conduct was "predatory". Judge Souter found that Turpin's prospects for rehabilitation were poor but cognizable; he rated them "5" on a scale of 0 to 10. Moreover, Judge Souter found that Turpin's crime against K.B. was not among the worst instances of second-degree sexual abuse of a minor. Nevertheless, the judge found that Turpin was among the worst offenders. *See State v. Wortham,* 537 P.2d 1117, 1120 (Alaska 1975); *Collins v. State,* 778 P.2d 1171, 1175 (Alaska App.1989).

Given the record in this case and given Judge Souter's findings, it is clear that a substantial term of imprisonment was warranted. Judge Souter found that Turpin had a lengthy history of sexually abusing children, that Turpin's prior, uncharged sexual abuse was even more serious than his present offense, and that Turpin was adamantly unwilling to acknowledge that he had committed any wrongdoing.

This court has upheld sentences of 6 years to serve plus additional suspended time for first-felony offenders convicted of class B felonies. *See Skrepich v. State,* 740 P.2d 950 (Alaska App.1987) (approving a sentence of up to 10 years' imprisonment with 4 years suspended for a 37–year–old karate instructor convicted of second-degree sexual abuse of a minor for engaging in a sexual relationship with a 15–year–old student), and *Kirlin v. State,* 779 P.2d 1251 (Alaska App.1989) (approving a composite sentence of 20 years' imprisonment with 8 years suspended (two consecutive sentences of 10 years with 4 years suspended) for a 41–year–old convicted of having sexual contact with two girls, ages six and seven). *Skrepich* and *Kirlin* both involved middle-aged defendants who, even though they were first-felony offenders, nevertheless had deep-seated patterns of sexually abusing children, demonstrated by their prior histories. In both *Skrepich* and *Kirlin,* this court relied heavily on the fact that the defendants had previously been charged with or investigated for sexual abuse of children, or had otherwise been confronted with their behavior in the past. *Skrepich,* 740 P.2d at 953 (the defendant was a fugitive from Ohio,

where charges relating to past sexual abuse of children were pending against him); *Kirlin,* 779 P.2d at 1252–53 (fourteen years before, the defendant had been convicted of "indecent liberties", a misdemeanor; later, the defendant's wife divorced him when she discovered that he had been abusing her children from a previous marriage; and the defendant was fired from his job at a movie theater for molesting two young girls).

As was true of the defendants in *Skrepich* and *Kirlin,* Turpin had previously been confronted with his behavior. The first instance involved Turpin's daughter, L.H. In March 1981, the police were called to investigate L.H.'s report that Turpin had sexually abused her by sleeping with her and engaging in various acts of sexual penetration and sexual contact. L.H. was thirteen years old at the time; she was taken from Turpin's custody and placed in foster care pending the investigation. L.H. later recanted her accusations; she was sent to live with her mother, and the criminal investigation was dropped. Eight years later, in July 1989, Turpin was again investigated for sexual abuse of a minor. This investigation involved Turpin's sexual relations with D.P. (before D.P. moved in with L.H. as a foster child). At that time, D.P. reported to her mother that Turpin had forced her to masturbate him and to masturbate herself when she spent the night at L.H.'s house. The police were called and an investigation commenced, but the investigation was dropped after Turpin delivered a letter (written by D.P.) to the Division of Family and Youth Services. In this letter, D.P. recanted her allegations of sexual abuse.

Neither of these prior investigations led to criminal charges, but they were sufficient to put Turpin on notice that his conduct was illegal and that sexual abuse of children was taken seriously by the authorities. Turpin nevertheless continued to sexually abuse children; the jury found that Turpin abused K.B., and Judge Souter found that Turpin had continued to abuse D.P. after the 1989 episode. By the time of his sentencing in this case, Turpin was a 46–year–old man. Judge Souter found that Turpin had sexually abused children for over a decade, that the

"predatory nature of [Turpin's] conduct" was "deeply ingrained", that Turpin adamantly and falsely denied any and all misconduct, and that Turpin's prospects for rehabilitation were poor.

Based on these findings, Judge Souter sentenced Turpin to 9 years' imprisonment with 3 years suspended—a sentence slightly less than the one imposed in *Skrepich*. Given the record in this case, and given this court's decisions in *Skrepich* and *Kirlin*, Judge Souter's sentencing decision is not clearly mistaken. *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

The judgement of the superior court is AFFIRMED.