**Emil L. WILLIAMS, Jr., Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–5635.**

Court of Appeals of Alaska.

Nov. 22, 1996.

Scott Jay Sidell, Anchorage, for Appellant.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

MANNHEIMER, Judge.

Emil L. Williams, Jr., appeals his convictions for second-degree sexual abuse of a minor, AS 11.41.436(a)(2). He also appeals the composite sentence he received for these crimes. We affirm.

On September 16, 1993, Williams was staying at his parents' home in Akiak. His cousins—eleven-year-old J.W. and her ten-year-old sister, C.W.—were also spending the night at the house, the guests of Williams's four sisters. Williams's parents were away from home that night; they left Williams and his eldest sister, Ruby, in charge of the house.

Everyone went to bed around midnight. J.W. fell asleep in one of her cousins' beds, dressed in jeans and a shirt. Shortly after 3:00 a.m., J.W. awoke to find that her pants had been removed and that someone was touching her genitals. She could not see who was touching her because she was lying on her stomach and the person was behind her on the bed. The touching continued for a few seconds. Shortly after the touching stopped, J.W. opened her eyes, turned around, and saw Williams ten to twelve feet away, walking toward his father's bed. J.W. pulled up her pants and went back to sleep.

A little while later, J.W. woke up again with her pants pulled down and someone's hands touching her genitals. She kept her eyes closed because she was too scared to open them. This time, when she heard footsteps walking away, she did not look to see who it was. Afterwards, she pulled up her pants and again fell asleep.

J.W. woke a third time, again with her pants pulled down and with a hand touching her genitals. This time, after the touching had stopped, she looked up and saw Williams sitting on his father's bed, facing away from her.

During that same night, C.W. (who had fallen asleep on the floor) awoke to find Williams on top of her, "going up and down". C.W. told the interviewing trooper that, through her clothing, Williams's genitals were touching hers. When C.W. woke up, Williams got off her. Afterwards, C.W. climbed into bed with J.W. and said "He's crazy." J.W. replied, "I know. Just go to bed."

The following day, J.W. told a teacher at school what had happened; the teacher re-

ported the incident to the authorities. Williams was indicted on four counts of second-degree sexual abuse of a minor: one count for each of the three incidents involving J.W., and a fourth count for the incident involving C.W. Following a jury trial in the superior court, Williams was found guilty of all four charges.

Williams contends that State Trooper Rosemary Decker was allowed to give inadmissible "victim profile" evidence during her testimony at his trial. In her direct examination, Decker described J.W. as "quiet, shy, [and] embarrassed" during their interview; she described C.W. as "the same, except she was a lot more reluctant to talk about what happened." Decker also testified that she had investigated over 200–250 cases of child sexual abuse.

At this point, Williams's attorney made a pre-emptive objection, arguing that it appeared the prosecutor was about to introduce evidence that J.W. and C.W. manifested the characteristics of sexual abuse victims. Superior Court Judge *pro tem* Mark I. Wood allowed the examination to continue after the prosecutor assured him that he was not seeking expert opinion from Decker and was not trying to compare J.W.'s and C.W.'s behavior with the behavior of other sexual abuse victims. Moments later, however, the prosecutor sought permission to ask Decker whether J.W. and C.W. had behaved like other victims of sexual abuse whom Decker had interviewed. Williams's attorney again objected, but Judge Wood overruled this objection. Decker then testified that the demeanor of J.W. and C.W. ("embarrassed and shy and reluctant") was consistent with the demeanor of other sexually abused girls she had encountered in her investigative experience.

■ On appeal, the State concedes that Judge Wood erred in allowing this testimony. This concession is well-taken. As this court has repeatedly held, testimony concerning the behavioral or psychological characteristics of sexual abuse victims is inadmissible "when it is used affirmatively, to establish that an alleged victim is in fact a victim—that a particular individual's claim of abuse is truthful because it is in some characteristic way 'consistent' with typical reports of

abuse." *Reece v. State,* 881 P.2d 1135, 1136–37 (Alaska App.1994); *see also Nelson v. State,* 782 P.2d 290, 297–99 (Alaska App. 1989); *Anderson v. State,* 749 P.2d 369, 373 (Alaska App.1988).

■ The State may introduce testimony analyzing the victim's behavior to rebut a defense argument that the victim failed to behave as one would expect a sexual abuse victim to behave. In Williams's case, however, the prosecutor was not responding to any defense attack on the credibility of J.W. and C.W.. Rather, the prosecutor presented Decker's testimony as affirmative evidence that J.W. and C.W. had been sexually abused. Offered for this purpose, Decker's testimony should not have been allowed.

■ We conclude, however, that this error was harmless in light of the way Williams argued his case. Through cross-examination and through argument, Williams's attorney presented the theory that the two girls had in fact been sexually abused but that they were mistaken when they identified Williams as their assailant. Relying on testimony that the Williams residence was frequently visited by other villagers, the defense attorney argued that an unknown intruder had entered the house while everyone was sleeping and had sexually abused the girls. Williams's attorney contended that J.W. and C.W. jumped to the conclusion that Williams had touched them because "as far as both of these girls knew, there was only one adult male at home, [only one man whom] they expected to see ... in the darkened house."

Williams's attorney essentially conceded that J.W. had been sexually abused, but he argued that J.W. could not accurately identify the person who touched her. The defense attorney pointed out that J.W. had kept her eyes closed during the three incidents and had only looked up after the touching stopped.

DEFENSE ATTORNEY: [J.W.] looked up, glanced for a moment, and saw someone who she thought [w]as a man, walking away in the direction of the bed over there.... She did not look at that person for the purpose of trying to make an identification[;] ... she looked up to make sure

that this person was walking away from her. And the two times that she saw someone walking ... away from her, she was, of course, not able to see that person's face, nor did she testify that there was anything about this person that she recognized as her cousin.

Because Williams conceded that J.W. had been sexually abused, Decker's testimony that J.W. behaved as one would expect a sexual abuse victim to behave had no prejudicial effect on the jury's deliberations on Counts I through III (charging sexual abuse of J.W.).

The error with respect to Count IV (charging sexual abuse of C.W.) is arguably a closer issue. With respect to this fourth count, Williams's attorney first argued that C.W. had been abused by an unknown intruder—that she was confused and mistaken when she identified Williams as her assailant:

DEFENSE ATTORNEY: [C.W.] says it was her uncle. Why? Two possibilities. Possibility number 1: it really was her uncle. [The prosecutor] has already covered that, so I think I'll talk about possibility number 2. This is a child, [only] ten years old. Something strange and disturbing and unusual had happened to her.

However, in light of C.W.'s testimony that she actually looked up and saw Williams while he was on top of her, Williams presented an alternative argument: that, regardless of who had been touching C.W., there was actually no genital contact, and thus this touching had not constituted "sexual contact" as defined in the statute. (Because of this argument, the court instructed the jury on the lesser-included offense of attempted sexual abuse of a minor in the second-degree. The jury found Williams guilty of the charged offense, thus rejecting Williams's argument that no genital contact had occurred.)

Even though Williams presented the alternative defense that C.W. had suffered no genital contact, we again conclude that the error in admitting Decker's "profile" testimony was harmless. Even when making this alternative argument, Williams essentially conceded that someone had climbed on top of C.W. during the night and had attempted to have sexual contact with her (even though the assault resulted in no actual genital contact). Thus, even if the assault on C.W. involved only attempted sexual contact, the jury could easily conclude that it would not be surprising for C.W. to behave like a sexual abuse victim. We conclude that the error in admitting Decker's testimony was harmless with respect to Count IV, given Williams's theories of defense.

■ Williams next contends that the three touchings of J.W.'s genitals were all part of a single continuing episode, so that (as a matter of law) the three touchings constituted only one offense of second-degree sexual abuse. See Tuckfield v. State, 621 P.2d 1350, 1352–53 (Alaska 1981); Tookak v. State, 648 P.2d 1018, 1022–23 (Alaska App.1982); Oswald v. State, 715 P.2d 276, 280–81 (Alaska App.1986), overruled on other grounds by Yearty v. State, 805 P.2d 987, 995 n. 3 (Alaska App.1991). The question is whether there was a sufficient break in time and circumstance between each act of sexual contact to support separate convictions.

■ Judge Wood found, based on the evidence, that the three acts of sexual contact were separate incidents. We review the trial judge's finding under the "clearly erroneous" standard. Coleman v. State, 846 P.2d 141, 142 (Alaska App.1993) (citing Donnybrook Bldg. Supply, Inc. v. First Nat'l Bank of Anchorage, 798 P.2d 1263, 1266 (Alaska 1990)).

■ Although J.W. could not estimate the amount of time that elapsed between each of the three touchings, she testified that she pulled up her pants and fell back to sleep after each incident. That is, Williams stopped touching J.W. and walked away each time she woke up; after she fell asleep again, he returned to touch her, each time pulling her pants down again. This evidence supports the conclusion that Williams made three separate, conscious decisions to go to J.W.'s bed and sexually abuse her. Each time he returned to her bed, Williams initiated a new and separate sexual contact. The record thus supports Judge Wood's conclusion that there were sufficient breaks in time

and circumstance to warrant three separate convictions for sexual abuse.

Williams's next argument is that the pre-sentence report contained information that was protected by Williams's privilege against self-incrimination. In 1987, Williams was adjudicated a delinquent minor for having committed a sexual assault; he was institutionalized at McLaughlin Youth Center. During a counseling session at McLaughlin, Williams admitted that he had committed other sexual offenses. This information was included in Williams's pre-sentence report in the present case.

■ In the sentencing proceedings in the present case, Williams argued that this information was elicited in violation of his privilege against self-incrimination because he had been in custody at McLaughlin and he had never received an explicit warning that what he revealed during counseling sessions could later be used against him. Williams therefore asked Judge Wood to strike this information from the pre-sentence report. Judge Wood denied this motion for two reasons.

First, Judge Wood found that Williams had previously waived any claim of privilege. In 1991, following his release from McLaughlin, Williams was arrested for a new incident and subsequently convicted of third-degree sexual assault. The pre-sentence report in that 1991 case explicitly referred to the statements Williams made at McLaughlin:

[W]hile Mr. Williams was in the entry level program[,] he "disclosed in CTU [the Closed Treatment Unit] that he ha[d] committed at least five other rapes. These incidents involved females of various ages who apparently were passed out or incapacitated with alcohol. Emil also reported fondling a three-year-old male when he was fifteen."

The pre-sentence report in Williams's present case referred to this 1991 pre-sentence report and suggested that Judge Wood review that earlier report, pointing out that the 1991 report indicated that Williams had "acknowledged at least five other rapes [of] women ... who were apparently passed out or incapacitated from alcohol". The current pre-sentence report also pointed out that Williams had acknowledged molesting a three-year-old boy.

Judge Wood ruled that Williams, by failing to object to the inclusion of this information in the 1991 pre-sentence report, had waived any claim of privilege with respect to the use of this information in future sentencing proceedings (such as the present one).

■ As a second ground of decision, Judge Wood ruled that the privilege against self-incrimination never applied to Williams's statements at McLaughlin. The judge reasoned that Williams's revelation of these other offenses posed no danger of self-incrimination, given the fact that Williams had already been adjudicated a delinquent and had been ordered institutionalized until his nineteenth birthday.[1]

---

1. The gist of Judge Wood's ruling was that, even though Williams's revelations during the McLaughlin counseling session worked to his disadvantage when he later committed additional sexual offenses as an adult, these revelations were not incriminatory at the time Williams made them. The judge believed that the only foreseeable circumstance in which Williams might suffer criminal consequences on account of these statements was if he later committed another crime. The Fifth Amendment does not protect against this danger. *M.R.S. v. State*, 867 P.2d 836, 840–41 (Alaska App.1994), *reversed on other grounds*, 897 P.2d 63 (Alaska 1995); *see also United States v. Apfelbaum*, 445 U.S. 115, 127–28, 100 S.Ct. 948, 955–56, 63 L.Ed.2d 250, 261–62 (1980) (the Fifth Amendment does not preclude the use of a defendant's immunized testimony at a subsequent prosecution for making false statements). *But see Marchetti v. United*

*States*, 390 U.S. 39, 53–54, 88 S.Ct. 697, 705, 19 L.Ed.2d 889, 900–01 (1968) (the Fifth Amendment privilege may in some instances be claimed when a person's statements will tend to incriminate him with respect to contemplated crimes).

In his ruling, Judge Wood referred in passing to the possibility that Williams might have been waived to adult status based on his admission of these other crimes. However, Judge Wood appears to have dismissed this possibility because (1) it had not happened and (2) by 1994, there was no further possibility that it would.

The double jeopardy clause of the United States Constitution would have prevented the State from re-opening Williams's juvenile delinquency petition and seeking to have him waived to adult status based on the crime for which he had already been adjudicated delinquent. *Breed v. Jones*, 421 U.S. 519, 531, 95 S.Ct. 1779, 1786–87, 44 L.Ed.2d 346 (1975). It is conceivable,

On appeal, Williams again asserts that his statements at McLaughlin were protected by the privilege against self-incrimination and that therefore they should not have been included in his most recent pre-sentence report. We find that Williams forfeited any self-incrimination claim. Assuming that Williams could have relied on his privilege against self-incrimination to block the use of these statements in his 1991 pre-sentence report, Williams failed to raise a claim of privilege. Williams allowed the superior court to rely on this information when the court sentenced him for third-degree sexual assault in 1991. Having allowed the court to use this information in 1991, Williams could not belatedly raise a claim of privilege in 1994.

Williams argues that he never "waived" his privilege against self-incrimination in 1991. He relies on cases defining "waiver" of a constitutional right as the "intentional relinquishment or abandonment of a known right or privilege". *See Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938). Williams points out that, during the sentencing proceedings in the 1991 case, no one personally addressed Williams, informed him of his right to object to the inclusion of the McLaughlin information in the pre-sentence report, and asked him if he was willing to waive his privilege against self-incrimination. Because of this, Williams asserts, his failure to object to inclusion of this information in the 1991 pre-sentence report did not constitute a waiver of his privilege against self-incrimination, and he was therefore free to renew his claim of privilege when the State again sought to use this information against him.

██ Although courts often speak of a "waiver" of the privilege against self-incrimination, this is inaccurate. No "waiver" (in the *Johnson v. Zerbst* sense) is required. The privilege is lost through a failure to assert it. The Supreme Court clarified this rule of law in *Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), when it addressed the claim that a probationer's answers to his probation officer's questions were extracted in violation of the Fifth Amendment:

We note first that the general obligation to appear and answer questions truthfully did not in itself convert Murphy's otherwise voluntary statements into compelled ones. In that respect, Murphy was in no better position than an ordinary witness at a trial or before a grand jury who is subpoenaed, sworn to tell the truth, and obligated to answer on the pain of contempt, unless he invokes the privilege and shows that he faces a realistic threat of self-incrimination. The answers of such a witness to questions put to him are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over his valid claim of privilege....

... The [Fifth] Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been "compelled" within the meaning of the Amendment. *United States v. Monia,* 317 U.S. 424, 427, 63 S.Ct. 409, 410, 87 L.Ed. 376 (1943) (footnote omitted).

This principle has been applied in cases involving a variety of criminal and non-criminal investigations. [citations omitted] These cases, taken together, "stand for the proposition that, in the ordinary case, if a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself." *Garner v. United States,* 424 U.S. 648, 654, 96 S.Ct.

---

however, that the State could have filed a new juvenile delinquency petition based on Williams's newly-revealed offenses, then sought waiver proceedings to have Williams tried as an adult for these newly-revealed offenses.

Obviously, this did not happen. Judge Wood appears to have assumed that if a statement is potentially incriminating when made, but if that potential for incrimination has disappeared by the time the government wishes to use the statement, then the Fifth Amendment does not block use of the statement. We need not delve farther into this issue because, as explained below, we hold that Williams forfeited his privilege against self-incrimination.

1178, 1182, 47 L.Ed.2d 370 (1976) (footnote omitted). Witnesses who failed to claim the privilege were once said to have "waived" it, but we have recently abandoned this "vague term," *Green v. United States,* 355 U.S. 184, 191, 78 S.Ct. 221, 225, 2 L.Ed.2d 199 (1957), and "made clear that an individual may lose the benefit of the privilege without making a knowing and intelligent waiver." *Garner v. United States, supra,* 424 U.S., at 654, n. 9, 96 S.Ct., at 1182, n. 9.

*Minnesota v. Murphy,* 465 U.S. at 427–28, 104 S.Ct. at 1142, 79 L.Ed.2d at 419 (most internal quotations omitted).

Thus, even though disclosure of certain information is protected by the Fifth Amendment privilege against self-incrimination, and even though a person is subpoenaed as a witness in a proceeding (and thus is under compulsion to testify), "a witness who reveal[s] information instead of claiming the privilege los[es] the benefit of the privilege". *Garner v. United States,* 424 U.S. 648, 653, 96 S.Ct. 1178, 1182, 47 L.Ed.2d 370, 377 (1976) (citing *United States v. Kordel,* 397 U.S. 1, 7–10, 90 S.Ct. 763, 766–69, 25 L.Ed.2d 1, 7–9 (1970)).

Williams argues that, while he was institutionalized at McLaughlin, he faced pressures to reveal incriminating information during the counseling sessions. He contends that, because of these pressures to reveal incriminating information, the normal rule (that the privilege is lost by failure to assert it) should not apply to institutionalized juveniles. Instead, Williams argues, he should have received an express advisement of Fifth Amendment rights before he was asked to participate in the counseling sessions. *Compare Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (creating such a rule for persons subjected to custodial interrogation by the police).

We need not resolve this issue. We assume, without deciding, that Williams did not lose his Fifth Amendment privilege when he made the statements during the McLaughlin counseling session. Nevertheless, Williams raised no claim of privilege when his statements were included in the 1991 pre-sentence report and when the superior court relied on these statements in sentencing Williams for the 1991 sexual assault. Once Williams allowed disclosure of this information in the 1991 sentencing proceeding, he could no longer rely on the privilege against self-incrimination to block the superior court's further use of the information. *See Garner v. United States,* 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976); *Rogers v. United States,* 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951); John William Strong et al., *McCormick on Evidence* (4th ed.1992), § 140, pp. 523–25. By failing to object in 1991, Williams forfeited his right to object to the superior court's renewed use of those statements in the present case.

We now turn to Williams's sentencing issues. As described above, Williams was convicted of four counts of second-degree sexual abuse of a minor. This crime is a class B felony, punishable by imprisonment of up to 10 years. AS 11.41.436(b); AS 12.55.125(d). Williams was a second felony offender by virtue of his 1991 conviction for third-degree sexual assault. He therefore faced a presumptive term of 4 years' imprisonment on each count. AS 12.55.125(d)(1).

The State proved three aggravating factors under AS 12.55.155(c): (c)(5)—that J.W. and C.W. were particularly vulnerable because of their youth and because Williams assaulted them while they slept; (c)(19)—that Williams had been adjudicated a delinquent minor for a sexual assault that would have been a felony had he been an adult; and (c)(20)—that Williams was on parole from his 1991 sexual assault conviction when he committed the crimes in the present case.

In addition, Judge Wood found that Williams was a worst offender. In 1987, at the age of fifteen, Williams was adjudicated a delinquent minor because he committed first-degree sexual assault. While he was in juvenile custody, Williams admitted that he had assaulted five other females who were either asleep or passed out from intoxication. In 1991, a few months after his release from juvenile custody at the age of nineteen, Williams committed third-degree sexual assault. And in 1993, a few months after he was released on parole from the 1991 convic-

tion, Williams committed the offenses in this case.

Judge Wood noted that Williams had twice committed new sexual offenses shortly after his release from custody for prior sexual offenses. Judge Wood also noted that Williams's present offenses were committed while he was on parole and receiving counseling. Given these facts, Judge Wood declared that the paramount sentencing goal should be protection of the public.

> THE COURT: [Williams] has a pattern of offending that's well-established—that goes back to 1987 or prior.... [W]e're dealing with a young man who's been out of jail [a total of] ten months since 1987. And, since 1987, [he] has [committed] three felonies related to sex.... [H]e has [assaulted] four victims for whom [he has been convicted]: two in this case, one in the '91 case, and one in the juvenile case. And ... five or six other victims that he has admitted to ..., for a total of nine or ten victims.
>
> ... [H]ow many victims is it going to take before Mr. Williams conforms to society's norms? ... [T]here is a tremendous risk to the public with Mr. Williams at large.
>
> ...
>
> Mr. Williams is a young man; he's twenty-one years old. But, unfortunately, the past is the best predictor of the future. And I agree with [the prosecutor] that it's not speculation as to what would happen if [Williams] were released this minute without further treatment. [He would] re-offend[.] Absolutely.

Judge Wood concluded that Williams was a worst offender within his class, and that the only way to stop Williams from committing more crimes was to keep him in jail. Judge Wood also found that protection of the public required a composite term longer than the 10–year maximum for any one of Williams's offenses. *See Mutschler v. State,* 560 P.2d 377, 381 (Alaska 1977). Based upon these findings, Judge Wood sentenced Williams to a composite term of 20 years' imprisonment with 8 years suspended (12 years to serve).

On appeal, Williams acknowledges that sentences this lengthy have been upheld for defendants convicted of second-degree sexual abuse of a minor. *See, e.g., Kirlin v. State,* 779 P.2d 1251 (Alaska App.1989). *See also Turpin v. State,* 890 P.2d 1128, 1131–34 (Alaska App.1995), and *Skrepich v. State,* 740 P.2d 950 (Alaska App.1987) (approving sentences of 6 years to serve plus suspended time). However, Williams argues that the defendants in those cases were middle-aged men with engrained patterns of sexual abuse, while Williams is still in his twenties and therefore has time to change.

We acknowledge that Williams is a youthful offender, but unlike the defendants in *Kirlin, Turpin,* and *Skrepich,* he is not a first felony offender. Williams is a second felony offender for presumptive sentencing purposes. Moreover, before Williams became an adult for criminal law purposes, he had a delinquency adjudication for first-degree sexual assault. As Judge Wood pointed out, Williams has been institutionalized, based on his commission of sex offenses, for all but a few months since he was fifteen. Williams committed his present offenses just months after his release on parole from his 1991 conviction.

Judge Wood recognized that Williams, because of his youth, still had prospects for rehabilitation. But Judge Wood also believed that Williams's youthfulness had to be gauged against his already lengthy pattern of sexual offenses:

> THE COURT: I find that it's necessary, absolutely necessary in this case, to [emphasize] isolation, because I don't know of any other way to protect the public from you at this point in time.... [R]ehabilitation and treatment is not a magic wand. I mean, the fact that you go into [the] Highland Mountain [sexual offender treatment program] does not mean you're going to be cured. [A treatment program is] not going to change your life, Mr. Williams. You have to change your life, and you have to do it from the inside out. You have to change the way you think, your attitudes towards yourself, towards women, ... towards your own sexuality[.] ... And then treatment might have [an effect]. But until you decide to make changes in your life,

... [to make] changes in your behavior ..., you are a complete risk to re-offend. And I have to protect the public.

Having independently reviewed the record, we find that it supports Judge Wood's conclusions and his decision to impose a composite sentence exceeding the 10–year maximum for any single count. We therefore conclude that Williams's composite sentence (20 years with 8 years suspended) is not clearly mistaken. *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

The judgement of the superior court is AFFIRMED.